Clara S. **BRUBAKER** et al., Plaintiffs-Appellants,

v.

**BOARD OF EDUCATION, SCHOOL DISTRICT 149, COOK COUNTY, ILLINOIS,** a body politic and corporate, et al., Defendants-Appellees.

No. 72–1898.

United States Court of Appeals, Seventh Circuit.

Heard Sept. 24, 1973.

Decided July 31, 1974.
On Rehearing En Banc
Dec. 17, 1974.

Fairchild, Circuit Judge, dissented and filed opinion.

Allen H. Gerstein, Chicago, Ill., for plaintiffs-appellants.

Mitchell J. Overgaard, Chicago, Ill., for defendants-appellees.

Before KNOCH and O'SULLIVAN,* Senior Circuit Judges, and FAIRCHILD, Circuit Judge.

O'SULLIVAN, Senior Circuit Judge.

This appeal concerns the discharge by defendant Board of Education of three public school teachers—plaintiff-appellants—for distributing or causing to be distributed to their eighth grade pupils allegedly obscene and improper reading materials. Action was brought against the appellees, Board of Education, its members and agents, in the United States District Court for the Northern District of Illinois, Eastern Division. For their cause of action, plaintiffs charged that defendants' action abridged their civil rights secured to them by 42 U.S.C. § 1983, and their rights under the First and Fourteenth Amendments. Jurisdiction of the Court was based upon 28 U.S.C. §§ 1332 and 1343(3) and (4). The litigation was concluded in the District Court by an order granting defendant-appellees' motion for summary judgment. From such order, plaintiffs appeal.

We affirm.

Clara S. Brubaker, John W. Brubaker and Ronald K. Sievert were teachers of eighth grade students in public schools operated by the Board of Education of District 149, Cook County, Illinois.

* Honorable Clifford O'Sullivan of the Sixth Circuit, sitting by designation.

They were all non-tenured, and their respective one-year contracts were to expire on June 12, 1970. Prior to the events here involved, the Brubakers had been advised that they would not be rehired, while Sievert had been notified that he would be retained for the 1970–71 school year.

In April, 1970, Clara Brubaker and another teacher, not involved here, attended the movie "Woodstock" which documented the 1969 rock festival by the same name. A number of relevant brochures were acquired at the theatre. These contained various articles, poems and pictures. One article—or poem—entitled "Getting Together" contained material which brought about the discharge of the plaintiffs. Its total content is set out in the brochure "Woodstock" a copy of which is made an appendix hereto. Those parts relating to drugs, sexual behavior and what might be called vulgarities are as follows:

"Woodstock felt like home. *A place to take acid. A place to make love.* Felt a little like a place we'd been before, but hard to remember, like yesterday's vision, like last night's dream. But now it's all now, *and it feels like we're never turning back.*

\* \* \* \* \* \* \*

Woodstock felt like a swell of energy, wave of elation that fills the heart *and flows on over the lover beside you.*

Woodstock was freedom. Don't ever forget that. Don't ever settle for less.

\* \* \* \* \* \*

Oh joy overflowing, *oh lover caressing,* I am what I have to share, oh take me completely!

\* \* \* \* \* \*

*Grass smoked together.*[1]

*Stink of our shit;* Music of Laughter.

Gathering together.

1. Acid and Grass are words popularly employed to identify LSD and marijuana, respectively.

*Bodies naked into the water, touching each other,* opening hearts into greater awareness of being together of living on the planet

of being part of something—a movement, a motion, like a drop of water in the crest of the tide, moving together *we're a big fucking wave . . . !*

\* \* \* \* \* \*

Its only the beginning.

\* \* \* \* \* \*

*Old world crumbling, new world being born."*

(Emphasis supplied.)

As a message to the minds of eighth graders, the brochure's poetry can and probably must be fairly read as an alluring invitation and a beckoning for them to throw off the dull discipline imposed on them by the moral environment of their home life, and in exchange to enter into a new world of love and freedom—freedom to use acid and grass, freedom to take their clothes off and to get an early start in the use of such vulgarities as "shit," "fucking," and their companions.

It is probably a fair inference that by second or third year high school most American males have become familiar with, and at times employ, these and like words. Is it only a forlorn hope, however, that most of our young ladies will never employ that kind of speech?

Clara Brubaker, who taught French at various primary grade schools, placed some of these brochures in the teachers' lounges and also gave copies to her husband, John Brubaker, and to Ronald Sievert, allegedly for use in their classes. She did not herself distribute any brochures to students, but did display one of the brochure's posters in her classroom.

Copies of the brochure were then made available to the eighth grade students in John Brubaker's and Ronald Sievert's classes. In due time, these brochures found their way into the homes of some of the students. When parents complained to the principal, appellee John Condon, (especially about the poem "Getting Together"), appellants were asked by Superintendent James R. Albert whether they had made copies of the brochure available to the students. He was told that appellants had done so, and Albert reported his findings to the appellee Board of Education members at a closed session on April 30, 1970. The next day the Board resolved to dismiss appellants as of May 4, 1970. Each teacher received a letter advising of the Board's adoption of the following Resolution:

"Resolve that [teacher's name] be dismissed as a teacher of the District effective May 4, 1970 for circulating within the schools of the District certain promotional material entitled "Woodstock" which material is of an obscene and suggestive nature, promotes a viewpoint contrary to the requirements of the laws of the State in regard to teaching about the harmful effects of alcoholic drinks and narcotics, and was distributed contrary to the provisions of policy 3547 of the Policies and By-Laws of School District 149, Cook County, Illinois, prohibiting the distribution within the schools or on school property of any material other than material purchased, procurred [sic] or furnished under the initiative and with the approval of the Board of Education of the District for distribution and use in its Educational Program.[2]

---

2. The school board's Policy 3547 reads:
"No material of any kind, whether or not bearing the imprint of a profit making organization, may be distributed by such organization, or any agent thereof, or any district employee, to students of the public school of this district, within the school, on school property, or at any district sponsored operation or function.
"No material of any kind, supplied by any non-profit organization may be distributed by such organization, or any agent thereof, or any district employee, until the Superintendent of Schools has approved such

"Be It Further Resolved that the secretary of the Board be authorized and directed to prepare a letter to the teacher notifying him [or her] of this action and that the Superintendent be authorized and directed to deliver said letter to the teacher in person as soon as convenient."

Before the effective date of discharge, an attorney contacted the School District, asking for "the setting of a hearing date with regard to the charges pursuant to which they [plaintiffs] were dismissed." This request was reiterated in a letter of May 15, 1970, from a staff attorney for the American Civil Liberties Union to the School District's attorney. The letter concluded:

"I also hereby demand a written bill of particulars, a list of witnesses who may or may not be called to testify on behalf of the school board, and copies of any written statements heretofore made by such witnesses in writing or made orally and committed to writing."

In this letter, plaintiffs' attorney also observed:

"There is a recent case, Roth v. Board of Regents, decided on March 9, 1970 in the federal court district for the Western District of Wisconsin, which, I am told, summarizes the procedural requirements for dismissal of non-tenured university professors at state institutions. However, I have not had time as yet to track down that opinion. Of course, it is our position that the same procedural due process standards apply to teachers in the public school system as to teachers in the public university system."

distribution. The Superintendent's decision shall be based on his judgment of the educational interests served in each individual case. Such decision will be reported to the Board of Education as informational items in its agenda."
Appellants Brubaker and Sievert testified that they were not aware of such policy. The Board was unable to prove the contrary.

On May 28, 1970, the School District attorney replied that the Board had considered plaintiffs' request but declined to grant such a hearing. No further action was taken, nor address made to the School Board for about a year, and then on April 22, 1971, this lawsuit was started. The District Court decision of Roth v. Board of Regents, 310 F.Supp. 972 (W.D.Wisc.1970), referred to in counsel for plaintiffs' letter of May 15, 1970, was then pending on appeal in this Court.

In their complaint, appellants charged that appellees had abridged their First and Fourteenth Amendment freedoms and their civil rights and in addition had breached their contracts and defamed them. Appellants each sought reinstatement, together with an award of back salary and compensatory and punitive damages for willful defamation in the amount of $200,000 each. An award of attorney fees was also sought.[3]

The complaint set out that Clara Brubaker had placed a number of the brochures in the teachers' lounges at four or five schools where she taught French, gave a number of copies to plaintiffs John Brubaker and Ronald K. Sievert, and "display[ed] the poster contained therein [in the brochure] in her classroom." She made no allegation that the brochure or its contents were in any way relevant to what she was teaching. It was further alleged that plaintiffs John Brubaker and Ronald K. Sievert had placed the brochures on their desks to be available to their students.

Appellants claim that the brochure had relevancy to what was being taught to the eighth grade students. Appellant Sievert said it had relevancy to his

3. The conclusion of their brief to this Court asks that:
"the case [be] remanded to the district court for entry of a judgment in favor of plaintiffs with respect to the violation of their constitutional rights and for the granting of a trial with respect to their claim of defamation of character."

teaching assignment—Language Arts—because under his guidance his class was studying the history of rock music. We are not advised what rock music has to do with Language Arts, but appellant Sievert testified:

> "We were to begin a new unit that day, but since we had just finished the other unit on the evolution of music I took out a brochure and I opened it up and instead of showing it I said, 'I have a brochure here which might be of interest to you because it seems to pertain specifically to what we just studied.'
>
> "And I said, 'It has a very colorful poster in it as well, which I think you may well be interested in,' and so I held up the poster part and got ooh's and ahh's from the class."
>
> \* \* \* \* \* \*
>
> "So most of them were rather impressed, I think, by the colorful poster, and after showing this to them I said they could have one after the class period."
>
> \* \* \* \* \* \*
>
> "Nobody took any until after the class period, when I said, 'Okay. Now you can come up and get the poster,' where they just rushed literally to the file cabinet and were just grabbing like crazy, trying to get as many as they could."

He testified that the brochure was not given to him by the school authorities; also that examination of it would quickly disclose that its material had not been prepared for classroom use.

He said that as to the poem "Getting Together" he felt that the young people could handle it quite well—"I was fearing mainly the reaction of parents and administrators."

Appellant John Brubaker's teaching assignment was solely "Industrial Arts." As to the relevancy of the Woodstock brochure to that subject, he said: "I think that this whole thing contributed to the interest of my class in musical instruments." He added that such would be true of the poetry also, saying that as to the words of the poem, "there was nothing wrong with them \* \* \* they were part of the regular vocabulary of youngsters of this age." Neither Brubaker not Sievert explained to their students any claimed relevancy of the Woodstock brochure.

In due course appellees made a Motion to Dismiss the Complaint, averring that plaintiffs had no constitutional right to a hearing concerning the reasons for their discharge; that plaintiffs had admitted the misconduct which had brought on their discharge; that furnishing eighth grade students brochures containing the language set out above was not an activity protected by the First or Fourteenth Amendments or an exercise of civil rights; and that such material was without relevancy to the classes taught by plaintiffs. Appellees further contended that dismissal of plaintiffs was not a breach of their teaching contracts, that the truth of the alleged defamatory language had been admitted by plaintiffs, and that the allegedly defamatory statements were privileged.

This motion was denied by District Judge Hubert L. Will by order entered September 16, 1971, as follows:

> "Order defendants' motion to dismiss the complaint is denied. Order defendants to answer complaint within 10 days."

Following appellees' ordered answer, plaintiffs on November 22, 1971, moved for a summary judgment as to its claims of "Violation of 1st and 14th Amendments" (Count I of their complaint) and "Violations of the Employment Agreements" (Count II). On December 21, 1971, District Judge William J. Bauer, to whom the case had been transferred, and upon the authority of this Court's decision in Roth v. Board of Regents, 446 F.2d 806 (7th Cir. 1971) (Reversed

thereafter in 1972 by the Supreme Court, Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548), ordered the Board to provide appellants with a hearing and a statement of the reasons for their discharges.

The ordered hearings were held in early 1972 at which appellants were represented by counsel. Prior to such hearings each plaintiff was provided with a statement of the reasons for dismissal. The one given to John Brubaker included the following:

"1. That on or about April 20, 1970 John Brubaker, while employed as an industrial arts teacher of School District 149, made available to students of the district a brochure entitled 'No one who was there will ever be the same' with the knowledge and intention that students would take and retain copies of the brochure for their personal reading and inspection.

"2. That among the written material contained within said Woodstock brochure was a poem entitled 'Getting Together' containing language of an obscene and suggestive nature and promoting or otherwise favorably portraying the use of drugs and other hallucinogens."

Reasons 3, 4 and 5 stated that the distributed brochure had not been approved for distribution and had not been prepared as a tool for school instruction; that appellants knew, or should have known, the contents of the brochure, and that Brubaker knew, or should have known, that:

"[T]he patent purpose of the brochure was to publicize a motion picture about and recorded music from the 1969 rock music festival known as the Woodstock Festival which festival was widely reported in newspapers and on television and criticized for the purported sexual promiscuity and drug use of its participants, and also since the film promoted by said brochure had been assigned and adver-

tized as having an R rating by its distributors which rating provided that persons under 17 years of age were not to be admitted unless accompanied by a parent or adult guardian."

Reasons 6 to 10 were as follows:

"6. That the language of the poem Getting Together contained in said brochure promoted a viewpoint contrary to the requirements of the laws of the State of Illinois in regard to teaching about the harmful effects of alcoholic drinks and narcotics as contained in Ill.Rev.Stat.1969, ch. 122, § 27-10.

"7. That the language in the poem Getting Together was contradictory and counteractant to the generally accepted objective of discouraging the use of drugs and other hallucinogens by young persons.

"8. That the language of the poem Getting Together contained in the brochure violates what are called the proprieties or the standards of what is socially acceptable in conduct, behavior and speech, especially as between adult and elementary school age children.

"9. That making the poem Getting Together as a part of the brochure available to elementary school age children without comment or criticism served no legitimate educational objective and that the language of the poem is not consistent with generally approved and professionally acceptable classroom material or generally accepted educational standards and practices.

"10. That the language and subject matter of the poem Getting Together contained in the brochure had no relevance or in any way related to the courses of study which John Brubaker was assigned to present nor which he was, in fact, giving."

Those furnished Clara Brubaker and Ronald Sievert were of similar sub-

stance; the assigned reasons were substantially those originally given to appellants with notice of their dismissals.

At the relevant public hearings, testimony was presented by plaintiffs and by the Board. Plaintiffs produced two eminently educated men who expressed the view that the poem "Getting Together" was proper material to be given to eighth grade students. Both had received Ph.D's from important American universities, and had studied and were currently active in the field of education.

The attention of these expert witnesses was called to the poem's reference to the apparent joys of smoking grass—marijuana—and its invitation to Woodstock as "a place to take acid"—LSD—and to make love. They knew of the transports and ecstacies suggested by:

"Oh joy overflowing, *Oh lover caressing* * * * Oh take me completely * * * *Grass smoked together. Stink of our shit;* music of laughter. * * * *Bodies naked* into the water, touching each other, opening hearts into greater awareness. * * * Of being part of something—a movement, a motion * * * moving together *we're a big fucking wave.*" (Emphasis supplied.)

Of the total work containing the above, one of such witnesses made the following comments:

"For all its apparent looseness as to Whitman, it has quality, it's very tightly constructed, and it seems not too bad a poem."

Further:

"I think there's a good deal of artistic imagination and integrity in that poem."

and, again,

"It would be very hard, I think to suggest that any of it is there for shock value, for crude and gross shock

value. He does get some shock value out of the literary contrast, but *for my money, it shows a great awareness of the literary tradition, a great sensitivity to language*, to the development of English and American poetry." (Emphasis supplied.)

and:

"You want a criticism, and I think myself that 'Oh lover caressing' is a little bit sentimental, but then you get from 'Oh lover caressing' down to the 'Bodies naked into the water,' where he plays the romantic sentimentality against the—well, the realism of 'Bodies naked into the water' is an actual knowledge of each other, *the opening of hearts into greater awareness.*" (Emphasis supplied.)

 * * * * * *

"I think the gentleness of this pose of lovemaking would be also of *very great educational value.* It might well have a considerable impression on them."

This same witness also considered the furnishing of the poem to the eighth grade children and stated that he thought the teaching methods of Brubaker and Sievert, employed in their Industrial Arts and Language Arts classes "are admirable." He expanded this compliment by observing:

"It seems to me that they establish quite clearly that they had a good deal of sensitivity with the children and knew precisely what children are interested in."

He said of the words used in the poem that,

"there are perhaps better words than seem to have been suggested, but I think that, you know, in a way, *these are sort of beautiful.*" (Emphasis supplied.)

When asked whether the distribution of the brochure *Woodstock* would fit the

"preponderant" opinion of the teaching profession, he answered, "it is the kind of material that is in public circulation and is, therefore, part of the material of the classroom." He thought also that providing such material to the students would help to develop a "rapport with these students * * * as this all increases the general fluidity and realism of the classrooms."

One of the experts also expressed himself as follows:

"[T]his is the real vision of the Woodstock thing, a whole notion of *a new sense of community* which I, for one, can deplore as having lost." (Emphasis supplied.)

This witness also testified as follows:

"Q. I kind of get the feeling, Doctor, that what you are saying is that life is different really from what we adults and educators would like it to be and that we had better really attune our educational program to what it is really like as against what we prefer it to be.

"A. If we are to serve the children instead of our own anxieties, yes, by all means."

Both of plaintiffs' experts disclosed current activities having to do with training the minds of today's children. One said he was,

"Engaged in the activity of the schooling and service training of teachers, to a degree watching them work with children."

The other referred to his research for the National Institute of Child Health and Human Development. Thus the above quoted excerpts portray the attitudes and beliefs of some of the *teachers of the teachers* of today's children. It was their opinion that teachers should not be required to get approval from school authorities before distributing such material as the Woodstock brochure to their students. Such a requirement, it was said, "demeans the teacher" and would,

"rigidify the teaching * * * it would simply make it at least difficult if not impossible to bring forth the kind of imaginative improvisation that * * * is especially important in a subject or a learning area like English."

Questioned as to whether the poem's suggestion of the joys of using drugs would offend the school's obedience to an Illinois statute requiring the teaching of the effects of the use of narcotics, one of the experts disposed of the subject as follows:

"Q. Referring to the reference to drugs in that poem, do you think this poem * * * would tend to glorify that use?

"A. I think it may in part, that the latter would be true."

And after some reference to what he described as our "drug addicted society," the witness concluded:

" * * * so this additional exposure of the drug experience [its joyful use at Woodstock] I can't conceive of it again as being anything but a *trivial* plus on the side of drug use."

He later gave emphasis to the above by referring to the poem's invitation to drugs as being "exceedingly trivial."

One of plaintiffs' experts found hypocrisy in the contrast between contemporary society's professed notions of morality and the total conduct of that society. He said,

"but as a social scientist it is my considered opinion that society in the form and conduct of that society is indeed a *sick society*."

We ponder, then, whether a vaccine or therapy to be given to our eighth graders for this sickness—the hypocrisy of their seniors—may be found in exposure to Woodstock and its invitations.

At the hearing, appellants Brubaker and Sievert said they had not read the poem "Getting Together" before they first made it available to their students. There was testimony by the Board's representative, however, that when these teachers were approached by him, they did not rely on such excuse. Rather, Brubaker and Sievert indicated that what was in the poem was something that the students "could handle." At the ordered hearing they reiterated such a view.

Relevant to the testimony of appellants Brubaker and Sievert that they had not read the quoted poetry when they gave it to their classes, it should be emphasized that a substantial interval of time elapsed between their claimed tardy reading of it, the Board's reaction to its distribution, and their termination. Neither of them, however, employed this interval to make an explanation or to express to their students disapproval of the poem.

A member of the staff of the Superintendent of Public Instruction for the State of Illinois testified in support of the action of the defendant Board. He was director of the state program for gifted children. By education and experience he was qualified to express his view that the Woodstock brochure and its poetry had no educational value and was inappropriate for distribution to grammar school children. He found invalid the offered excuse that appellants had not read the brochure's poem "Getting Together" before distributing it. We share this view. Parents of children who had brought the Woodstock brochure home also testified in support of the Board's action.

We think it right also to observe that upon learning of the Board's reaction to what had happened, none of the plaintiffs expressed any regret over the matter; neither did any of them seek reinstatement by assurance that corrective measures would be taken. They made no effort to come to a friendly solution with the Board. Their first step was employment of a lawyer who demanded a plenary hearing. This lawsuit followed almost a year thereafter. Whatever their ambivalence as to whether what they did was at most an innocent mistake or done after deliberation, their lawsuit insists and relies solely upon a position that what they did—providing, with their apparent approval, the Woodstock poetry—was but an exercise of the academic freedom guaranteed them by the United States Constitution.

After the hearing, the Board, by resolution adopted April 8, 1972, ratified and confirmed the dismissal of plaintiff-appellants. The resolution stated in part:

"WHEREAS, the Board of Education has heard the evidence presented by and on behalf of the teachers, and on behalf of the School Administration and has heard the arguments of counsel

\* \* \* \* \* \*

the Board \* \* \* finds that each of the reasons for the dismissal of the teachers served upon them on January 14, 1972 by service on their attorneys has been sustained by the evidence; \* \* \*."

Plaintiffs and defendants thereafter filed renewed cross-motions for summary judgment, and on August 21, 1972, District Judge William Bauer denied plaintiffs' motion and granted defendants' motion. In deciding the legality of plaintiffs' discharge, the Court felt that the question before it was: "have the plaintiffs herein been discharged for a basis wholly unsupported in fact or for a basis wholly without reason?" It would appear that by this expression District Judge Bauer was employing the language used by the District Judge in the case of Roth v. Board of Regents, 310 F.Supp. at 979. Upon a review of the proceedings before the Board, the Court concluded:

"It is this Court's opinion that the distribution of the brochure is a basis

for discharge that is not wholly without reason. The brochure contains a poem entitled 'Getting Together' which contains profane words and favorable references to drugs; this Court cannot say that all reasonable men would find that this poem was suitable reading material for elementary school children.

"Accordingly, this Court holds that there was a basis for discharge of the plaintiffs which was not wholly unsupported in fact or wholly without reason."

■ That part of the District Court order which reads, "this Court cannot say *that all reasonable men* would find that this poem was suitable reading material for elementary school children," is unknown to us as a rule controlling the District Court's disposition of the matter. We consider, however, that his order's total language constituted a finding adequate to sustain the final judgment.

■ The Issues Presented for Review,[4] as set out in appellants' brief, are:

That the District Court erred,

"1. In failing to find that plaintiffs' constitutional rights, including particularly their academic freedom rights as protected by the First Amendment, were infringed by defendants' action in dismissing plaintiffs from their employment as teachers.

"2. In failing to award plaintiffs back pay and attorneys' fees based on

the district court's earlier ruling that plaintiffs had been denied procedural due process in that they had not been given notice and a hearing prior to their discharge.

"3. In summarily dismissing plaintiffs' claim relating to defamation of character, when said claim raised genuine issues as to material fact which were incapable of resolution on a motion for summary judgment."

I. *First Amendment and Civil Rights.*

We have set out the factual background of this case at the above length because we believe that such recitation exposes the correctness of our affirmance of the District Court's holding that the School Board's action was not arbitrary or capricious, and was not an invasion of the appellants' constitutional rights. Appellants assert that making available to their eighth grade students the Woodstock brochure's poem "Getting Together" was an exercise of the free speech guaranteed to them by the First Amendment and an exercise of their Civil Rights, protection of which is vouchsafed to them by 42 U.S.C. § 1983. They said that their dismissal invaded their Right of Academic Freedom, and they suggest that what was done would have a "chilling effect" on the exercise of academic freedom by other teachers.

We do not believe that however much the reach of the First Amendment has been extended and however eager today's courts have been to protect the many va-

---

4. Appellees present a preliminary procedural question asserting that the appeal by Clara Brubaker is not before us. The notice of appeal lists Clara S. Brubaker, John W. Brubaker and Ronald K. Sievert in their individual capacities as parties in this appeal. Relying on Rule 3(c), Federal Rules of Appellate Procedure, appellees argue that because Clara died over one year before the appeal was taken, the notice should have stated that the appeal was being taken in the name of "John Brubaker, individually, and as representative of Clara Brubaker," or words of like import.

It may well be that given a narrow construction of Rule 3(c), we would have no jurisdiction to entertain Clara's appeal. This view was adopted by the Ninth Circuit in Penwell v. Newland, 180 F.2d 551 (9th Cir. 1950). In that case, however, only one party was named in the notice of appeal, whereas in the present case, John Brubaker who is Clara's personal representative by appointment of the Cook County, Illinois, Probate Court, is also a party. Her name is included in the notice of appeal. We believe that the estate of Clara Brubaker is a party to the appeal before us.

rieties of claims to civil rights, the appellee school board had to put up with the described conduct of appellants.

Appellants' address to us includes this statement:

"[I]nquiry should be made by the court as to whether the publication in question was inappropriate reading for the students involved and whether a serious educational purpose was sought to be achieved. Plaintiffs' expert testimony at the hearing before the School Board, and defendants' lack of testimony concerning this issue, established beyond any reasonable doubt that the use of the Woodstock brochure by plaintiffs was not only appropriate, *but admirable as a teaching tool.*" (Emphasis supplied.)

Relevant to this assertion, we observe that neither the appellants nor their experts emphasized with any degree of specificity what parts of the brochure, other than the poetry, could be classified as "admirable as a teaching tool." The experts primarily addressed their applause to the poem.

■■ Appellants further argue that they were denied due process,

"because there existed a lack of ascertainable standards by which they could measure their conduct."

They do not attempt definition of the relevant and ascertainable standards which they say the School Board should have promulgated. We will not fault a school board for not anticipating that eighth grade teachers might distribute to their students, without explanation or assigned reason therefor, poetry of the caliber of "Getting Together." Appellants say that the Board was wrong because it reached a conclusion as to the poetry's impropriety,

"[w]ithout the benefit of any supporting expert testimony in the fields of literature, obscenity or drugs."

Experts should not be needed to support a conclusion that is obvious. Moreover,

the Supreme Court, in Paris Adult Theatre I v. Slaton, 413 U.S. 49, 56, 93 S.Ct. 2628, 2634, 37 L.Ed.2d 446 (1973), rejected the contention that " 'expert' affirmative evidence that the materials were obscene," was necessary when the alleged obscene material was itself placed in evidence. Similarly in this case no "expert" testimony was required.

Relative to the brochure's admitted invitation to the use of drugs, the evidence disclosed that Ill.Rev.Stat. ch. 122, § 27–10 required that the "Nature and effect of alcoholic drinks and narcotics and their effects on the human system" be taught to pupils below the second year of high school and above the third year of elementary school work. Appellants argue that they were not aware of such statute, and that, therefore, it "did not constitute the kind of constitutionally permissible ascertainable standard which should have placed plaintiffs on notice that their conduct in distributing the Woodstock brochure [with its glorification of grass and acid] would subject them to dismissal." Whether they knew of the statute or not, we consider that these teachers should have known better than to hand to their young students something that invited the use of the described drugs. Additionally, appellants had been aware of and had participated in previously presented teaching programs expounding upon the baleful consequences of the use of drugs and alcohol.

In rejecting appellants' claim of academic freedom, we note the following from the First Circuit's opinion in Mailloux v. Kiley, 436 F.2d 565 (1st Cir. 1971), where a claim of academic freedom was similarly raised. There the Court said:

"The court in no way regrets its decision in Keefe v. Geanakos, 1 Cir., 1969, 418 F.2d 359, but it did not intend thereby to do away with what, to use an old-fashioned term, are considered the proprieties, *or to give carte blanche in the name of academic free-*

*dom* to conduct which can reasonably be deemed both offensive and unnecessary to the accomplishment of educational objectives. *Cf.* Close v. Lederle, 1 Cir., 1970, 424 F.2d 988, cert. denied, 400 U.S. 903, 91 S.Ct. 141, 27 L. Ed.2d 140. Here, particularly, such questions are matters of degree involving judgment on such factors *as the age and sophistication of students, relevance of the educational purpose, and context and manner of presentation.*" 436 F.2d at 566. (Emphasis supplied.)

In affirming the District Court order on remand, the First Circuit also said in Mailloux v. Kiley, *supra,*

"With all respect to the district court's sensitive effort to devise guidelines for weighing those circumstances, 323 F.Supp. 1387, we suspect that any such formulation would introduce more problems than it would resolve. At present we see no substitute for a case-by-case inquiry into whether the legitimate interests of the authorities are demonstrably sufficient to circumscribe a teacher's speech." 448 F.2d at 1243.

█ The validity of our conclusion that the District Court properly found no violation of appellants' First Amendment or Civil Rights emerges so clearly that we decline to add, by our own extended dissertation, to the already abundant literature on the subject we deal with.

II. *Back Pay and Attorney Fees.*

1) *Back pay.*

Appellants argue that in all events the Brubakers are entitled to an award for the pay that they would have received from the date of their termination—May 4, 1970—to the end of the school year—June 12, 1970. Appellant Sievert seeks back pay for the above period and for the pay he would have received for

the school year 1970–1971. As noted previously, all appellants were non-tenured teachers: the Brubakers had been advised before May 4, 1970, that they would not be employed for the following year. Sievert, however, had been advised before May 4, 1970, that they the 1970–71 school year. Appellants' position is that notwithstanding that they had been given the reasons for their termination, they were also entitled to, but initially refused, a hearing. They argue that the court-ordered hearing did not provide them with due process.

Cases cited by appellants to support their claims for an award of back pay are distinguishable from the present case. Horton v. Orange County Bd. of Educ., 464 F.2d 536, 538 (4th Cir. 1972); Rolfe v. County Bd. of Educ., 391 F.2d 77, 81 (6th Cir. 1968); Jackson v. Wheatley School Dist. No. 28, 464 F.2d 411 (8th Cir. 1972); Bates v. Hinds, 334 F.Supp. 528, 533 (N.D.Tex. 1971); Callaway v. Kirkland, 334 F. Supp. 1034, 1038 (N.D.Ga.1971). In so distinguishing, we emphasize that the notices of termination given to appellants each set out the reasons therefor. As ordered, a plenary hearing was had before the School Board. The District Court held, and this Court now holds, that there was good cause for termination of each of the appellants.

In Horton v. Orange County Board of Education, *supra,* the court emphasized that:

"In none of the letters advising her [the discharged teacher] of the termination was she told of the grounds therefor." 464 F.2d at 537.

Such failure is not present in our case.

Back pay was also allowed in Rolfe v. County Board of Education, *supra,* where the Sixth Circuit affirmed a District Court judgment,

"holding that the discharge of two schoolteachers, [plaintiffs] appellees herein, was discriminatory because it

was based on consideration of race." 391 F.2d at 78.

Also in Jackson v. Wheatley School District, No. 28 *supra*, the Eighth Circuit recited that in an earlier hearing of the same case,

"we held that the Wheatley School Board had unlawfully discharged three black teachers [the plaintiffs in the above cited case]." 464 F.2d at 412.

In Bates v. Hinds, supra, the District Judge's opinion does not consider, nor rule upon, whether there were valid grounds for dismissal of the involved teacher. Although Bates was awarded back pay and attorney fees, the court's ruling and award appear to have been bottomed upon the failure of the school authorities to give the discharged teacher a fair hearing or adequate notice of the reasons for his discharge. The District Judge said, *inter alia*:

"Plaintiff never received official word of his termination." 334 F.Supp. at 531.

\* \* \* \* \* \*

"The teacher \* \* \* was not given written notice of the charges against him \* \* \*." 334 F.Supp. at 532.

\* \* \* \* \* \*

"The Court concludes that Bates' hearing satisfied neither the procedural due process standards set out by the Fifth Circuit nor the rudiments of fair play." 334 F.Supp. at 533.

The case of Callaway v. Kirkland, *supra*, presented some procedural novelties inasmuch as the parties did agree upon a settlement. A District Judge, however, awarded back pay over and above the amount received by the teacher upon the settlement. In doing so, the District Court said:

"Since there has been no correction of the procedural defects connected with plaintiffs' dismissal *and no adjudica-*

*tion of the basis for the dismissal*, the court need look no further than its ruling of December 29, 1970, to find that defendants unlawfully interfered with plaintiff's expectancy of reemployment by summarily dismissing him without affording him procedural due process. Therefore, plaintiff is entitled to recover the back pay which he seeks."

\* \* \* \* \* \*

"Plaintiff has consistently denied defendants' allegations of misconduct and has never been provided with a meaningful opportunity to counteract those allegations." 334 F.Supp. at 1038. (Emphasis supplied.)

It is clear that none of the above cases are in point here where written notice of the reasons for termination were given, a court-ordered plenary hearing on the matter was had and the school board, a District Court, and this Court, hold that appellants were terminated for just cause.

We are essentially being asked to rule that where school authorities are made aware of a non-tenured teacher's misconduct, they must continue such teacher in service until a full-dress hearing has been provided, or pay the terminated teacher's salary until such hearing can be arranged. We decline to do so in this case where the propriety of the termination has been fully vindicated by the record made upon such hearing. It should also be emphasized that the attorney early engaged by appellants was promptly advised that his request for a hearing had been submitted to and declined by the Board. At the time of these events, no decision of the United States Supreme Court, a United States Court of Appeals, or the courts of Illinois, had held that a hearing had to precede termination.

We mention, too, that appellants waited for almost a year from the time they received the reasons for their termination before instituting this lawsuit. At

that time there was pending before this Court an appeal from a District Court holding that two non-tenured college professors were entitled to a hearing before they were refused reemployment for another year. The decision of this Court affirming such holding was announced July 1, 1971, after this suit was started, Roth v. Board of Regents of State Colleges, 446 F.2d 806 (7th Cir. 1971). Such decision was reversed by the Supreme Court in Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). The Supreme Court there held that non-tenured teachers are not entitled to a hearing upon a decision of school authorities not to reemploy them. That decision, however, held that termination of such teachers *during* an existing school year had to be accompanied by obedience to due process, 408 U.S. at 576–577, 92 S.Ct. 2701. But it did not say that termination had to await a hearing regardless of whether such hearing ultimately disclosed that the termination was for good cause.

We are aware of decisions which, under their facts, have said that a due process hearing should have preceded the challenged action. Such cases were referred to in footnote seven in Board of Regents of State Colleges v. Roth, 408 U.S. at 570, 92 S.Ct. 2701, cited to consider the need for a hearing *"before* the termination becomes effective." Bell v. Burson, 402 U.S. 535, 542, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971). In *Bell,* a Georgia statute allowed suspension of the driver's license of an uninsured motorist "involved in an accident * * * unless he posts security to cover the amount of damages claimed *by aggrieved parties in reports of the accident."* (Emphasis supplied.) Such action would take place without reference to whether the public authorities had, or claimed to have, made any investigation as to whether the driver in question was at fault. In the present case, however, the school authorities had investigated the charged misconduct, and such misconduct was admitted to have occurred. The School Board's decision to discharge

appellants and their reasons therefor were made known to appellants. In the other case cited in Roth, Cafeteria & Restaurant Workers Union, Local 473 v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961), the Court stated the following:

"The Fifth Amendment does not require a trial-type hearing in every conceivable case of government impairment of private interest, 'For, though "due process of law" generally implies and includes *actor, reus, judex,* regular allegations, opportunity to answer, and a trial according to some settled course of judicial proceedings, . . . yet, this is not universally true.' Murray's Lessee v. Hoboken Land and Improvement Co., 18 How. 272, 280 [15 L.Ed. 372.] The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation. Communications Comm'n v. WJR, 337 U.S. 265, 275–276 [69 S.Ct. 1097, 1103, 93 L.Ed. 1353]; Hannah v. Larche, 363 U.S. 420, 440, 442 [80 S.Ct. 1502, 1513–1514, 4 L.Ed.2d 1307]; Hagar v. Reclamation District No. 108, 111 U.S. 701, 708–709 [4 S.Ct. 663, 667, 28 L. Ed. 569]. *' "[D]ue process," unlike some legal rules is not a technical conception with a fixed content unrelated to time, place and circumstances.' "* 367 U.S. at 894–895, 81 S.Ct. at 1748 (Emphasis supplied.)

We find no decision of the Supreme Court or of any of the Courts of Appeals holding that where, as here, the propriety of the discharge is sustained after plenary administrative and judicial hearings, the public authority—here a school board—must nevertheless pay the discharged employees their wages until such hearings shall have been concluded, however long delayed. The rule that appellants ask us to announce would require that, however wrong the admitted conduct of a school teacher, a school board must refrain from discharging her or him until a full dress hearing upon whether such conduct warranted

discharge can be arranged and concluded. We decline to so hold.

■ We come finally to the question of whether the termination of the appellants without a *prior* hearing denied them due process of law. Since this case was heard in the District Court, and thereafter submitted to us on appeal, the Supreme Court opinion in Arnett v. Kennedy, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), has come down. We consider that its majority opinion sets at rest the question of whether, no matter what the cause, a hearing must as a matter of obedience to the Constitution, *precede* the termination of a teacher or any public employee. We read the opinion as holding that. such a *prior* hearing is not in all cases constitutionally essential. There, a civil service employee was terminated in conformity with an Act of Congress—5 U. S.C. § 7501—which, after setting out certain procedures that had to precede termination of a civil service employee, concluded:

> "Examination of witnesses, trial, or hearing is not required but may be provided in the discretion of the individual directing the removal or suspension without pay."

The Act required notice of the charges upon which termination was made and also provided for an appeal that could be taken after the termination to test the validity of the discharge. Without resort to such departmental procedures, the involved employee began an action in the United States District Court attacking his discharge and asserting, as set out in Arnett v. Kennedy, *supra,*

> "that the charges were unlawful because he had a right to a trial-type hearing before an impartial hearing officer *before* he could be removed from his employment * * *." 94 S.Ct. at 1637. (Emphasis supplied.)

He further asserted that statements made by him which caused his termina-

tion "were protected by the First Amendment to the United States Constitution." It was his position that his discharge *prior* to a hearing denied him "procedural due process of law."

A three-judge District Court, convened pursuant to 28 U.S.C. §§ 2282 and 2284, held that the discharge procedures authorized by the Act and attendant Civil Service and OEO Regulations denied appellee due process of law. By summary order it directed that appellee be reinstated in his former position with back pay, and that he be accorded a hearing *prior* to removal in any future removal proceedings. The District Court decision, reported as Kennedy v. Sanchez, 349 F.Supp. 863 (N.D.Ill.1972), sets out the claim which it sustained and its dispositive ruling as follows:

> "[T]he procedure by which Kennedy's employment was terminated deprives him and his class (which has not been determined) of due process under the Fifth Amendment by its failure to provide a full evidentiary hearing *prior* to termination, with the right to be heard by an impartial hearing officer; the right to present witnesses; the right to confront and cross-examine adverse witnesses; and the right to a written decision indicating the reasons for discharge or suspension and the evidence relied upon. This Court agrees." 349 F.Supp. at 864.

■ As we read it, the majority opinion of the Supreme Court in reversing the District Court held that a plenary hearing before a termination is not a constitutional essential of due process. There the Court was specifically dealing with a relevant Act of Congress wherein it was provided that in terminating a civil service employee it was not required that a hearing must be had *prior* to discharge. The thrust of the Court's holding can best be gleaned from its statement as to the issue involved. The Court said:

> "We must first decide whether these procedures established [by the Con-

gress] for the purpose of determining whether there is 'cause' under the Lloyd-LaFollette Act for the dismissal of a federal employee *comport with procedural due process*, and then decide whether that standard of 'cause' for federal employee dismissals *was within the constitutional power of Congress to adopt.*" 94 S.Ct. at 1641. (Emphasis supplied.)

Its controlling opinion concluded that such procedures did comport with due process and that they were within the constitutional power of Congress to adopt. The opinion from which we quote above was written by Mr. Justice Rehnquist, with concurrence by the Chief Justice and Mr. Justice Stewart. A separate opinion was written by Mr. Justice Powell with the concurrence of Mr. Justice Blackman. Justice Powell's opinion emphasized the post-termination procedures provided in the relevant Act of Congress. It began with the observation, *inter alia*, that,

> "I also agree that appellee's discharge did not contravene the Fifth Amendment guarantee of procedural due process." 94 S.Ct. at 1649.

and concluded that:

> "On balance, I would conclude that *a prior evidentiary hearing is not required* and that the present statute and regulations comport with due process by providing a reasonable accommodation of the competing interests." 94 S.Ct. at 1653. (Emphasis supplied.)

We are aware that Justice Powell appears to have been motivated in part by the post-termination procedures available to, but not employed by, the discharged employee. As to the reach of the discussed opinion, we observe that it is the law that the Congress may not by its legislation override the Constitution any more than other public employers may do so. Applicable to the case at bar there did not exist any Illinois statute spelling out procedures to be followed in termination of a school teacher. In all events, the *Kennedy* decision sets at rest and denies appellants' contention that absent a *prior* hearing the school board must pay back wages to the appellants. The appellants have now had a plenary hearing, the disclosures of which sustain the validity of the school board's action. The fact that a hearing was initially refused and was had only when ordered by the District Court does not impair the rightness of what was originally done. We repeat that at the time of appellants' termination there was no clear rule of law or constitutional command that a hearing was required. It is relevant too that appellants waited for nearly a year before invoking judicial help. At no time have appellants denied the doing of that which prompted the school board's action. Their defense is, and was, that they had the right to do what they did. It should be mentioned that their initial demand for a hearing neither denied the factual recitals of the notice of termination, nor relied upon a claim ultimately made that what they did was merely an exercise of academic freedom.

■ Evidence at the hearing disclosed that complaints by the parents of appellants' students activated the investigation which led to the board's action. It was right for school authorities to take cognizance of such parental concern. The board did not act without providing appellants with opportunity to explain or offer justification for what they had done. Appellants did neither, and their first response was to employ a lawyer.

Upon consideration of the record before us, we decline to award back wages to appellants.

#### 2) *Attorney fees.*

Allowance of attorney fees is an "inherent equitable power" of the court, utilized wherever " 'overriding considerations indicate the need for such a recovery.' " Hall v. Cole, 412 U.S. 1, 5, 93

S.Ct. 1943, 1946, 36 L.Ed.2d 702 (1973). The Court in *Hall* stated the following principles for awarding attorney fees:

"Thus, it is unquestioned that a federal court may award counsel fees to a successful party when his opponent has acted 'in bad faith, vexatiously, wantonly, or for oppressive reasons.' 6 J. Moore, Federal Practice ¶ 54.77 [2], p. 1709 (2d ed. 1972); see, e. g., Newman v. Piggie Park Enterprises, Inc., 390 U.S. 400, 402 n. 4 [88 S.Ct. 964, 966, 19 L.Ed.2d 1263] (1968); Vaughan v. Atkinson, 369 U.S. 527 [82 S.Ct. 997, 8 L.Ed.2d 88] (1962); Bell v. School Bd. of Powhatan County, 321 F.2d 494 (CA 4 1963); Rolax v. Atlantic Coast Line R. Co., 186 F.2d 473 (CA 4 1951). In this class of cases, the underlying rationale of 'fee-shifting' is, of course, punitive, and the essential element in triggering the award of fees is therefore the existence of 'bad faith' on the part of the unsuccessful litigant.

"Another established exception involves cases in which the plaintiff's successful litigation confers 'a substantial benefit on the members of an ascertainable class, and where the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to spread the costs proportionately among them.'" 412 U.S. at 5, 93 S.Ct. at 1946.

 This Court has long held that it is within the discretion of the District Court to allow or refuse the award of attorney fees, and that we will interfere only where that discretion has been abused. Gordon v. Illinois Bell Telephone Co., 330 F.2d 103, 107 (7th Cir.), cert. denied, 379 U.S. 909, 85 S.Ct. 197, 13 L.Ed.2d 182 (1964); Milwaukee Towne Corp. v. Loew's, Inc., 190 F.2d 561, 571 (7th Cir. 1951), cert. denied, 342 U.S. 909, 72 S.Ct. 303, 96 L.Ed. 680 (1952); Official Aviation Guide Co. v. American Aviation Associates, Inc., 162 F.2d 541, 543 (7th Cir. 1947).

 We find no such abuse in the present case. Our review convinces us that the board acted at all times in good faith; it did not intend to be oppressive as to the rights of appellants. We similarly find no benefit being conferred on "other members of an ascertainable class," *Hall, supra.*

### III. *Defamation.*

 In count III of their complaint, appellants alleged that:

"The statements made by defendant members of the BOARD OF EDUCATION . . . *were false and were known by said defendants to be false* when made, recorded and published by them. Said statements were made by defendant members of the BOARD OF EDUCATION with the purpose of injuring plaintiffs."

As a result of such statements, appellants claim to have suffered irreparable harm to their reputations. This claim was dismissed by Judge Bauer on defendants' motion for summary judgment.[5]

5. One of appellants' arguments is that Judge Bauer's August 21, 1972 dismissal of their claim on a motion for summary judgment was improper because Judge Will, on September 16, 1971, had refused to grant appellees' motion for summary judgment. In Bowles v. Wilke, 175 F.2d 35, 37 (7th Cir.), cert. denied, 338 U.S. 861, 70 S.Ct. 104, 94 L.Ed. 528 (1949), this Court stated:

"We think it beyond question that as to interlocutory orders entered in the District Court, the trial judge himself or any judge succeeding him in the disposition of a pending cause may vacate any such prior order. The only restraint upon a second judge in passing upon an interlocutory issue decided by another judge in the same case is one of comity only, which in no way infringes upon the power of the second judge to act."

Under the circumstances of this case, Judge Bauer did not act improperly in granting appellees' renewed motion to dismiss. A period of almost one year had elapsed between Judge Will's and Judge Bauer's rulings. It was during this period that the facts of the case were developed and the issues narrowed.

We first observe that the only relevant *falsity* resides in appellants' above charge that the statements made by the Board "were false." The truth of the facts upon which the terminations were made was admitted by appellants. We, however, discuss the subject this much further. Appellants' brief alleges that "the matter" was discussed in "executive session" held on April 30, 1970, and an agreement as to dismissing appellants was reached on May 1, 1970. They allege further, however, that the resolution to dismiss, as set out at length herein, "was adopted in open session." Statements made at such meetings have been held by the Illinois Courts to be absolutely privileged. McLaughlin v. Tilendis, 115 Ill.App.2d 148, 253 N.E.2d 85, 88 (1969); Larson v. Doner, 32 Ill. App.2d 471, 178 N.E.2d 399 (1961).

Because the question of whether an absolute privilege exists is a matter for the court to decide, Larson v. Doner, *supra*, 32 Ill.App.2d at 472, 178 N.E.2d at 400, and because there were no issues of material fact, the District Judge properly dismissed appellants' defamation claim.

The decision of the District Court is affirmed.

FAIRCHILD, Circuit Judge (dissenting).

I do not believe that the Woodstock brochure was either so irrelevant to educational goals or patently offensive that the plaintiffs were precluded from exercising their judgment as teachers and electing to employ it in their classes. Accordingly, I respectfully dissent from the majority's conclusion that the district court correctly held these discharges did not violate first amendment rights. I concur regarding the failure to award attorneys' fees or back pay pending the Roth-type hearing, and dismissal of the defamation action.

Freedom to discuss controversial or unpopular ideas in the schools is "a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom." Keyishian v. Board of Regents, 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1966). See also Tinker v. Des Moines School Dist., 393 U.S. 503, 506–507, 89 S.Ct. 733, 21 L.Ed.2d 31 (1969). Academic freedom "does not grant teachers a license to say or write in class whatever they may feel like." Mailloux v. Kiley, 448 F.2d 1242, 1243 (1st Cir., 1971). See Clark v. Holmes, 474 F.2d 928, 931 (7th Cir., 1972), cert. denied 411 U.S. 972, 93 S.Ct. 2148, 36 L.Ed.2d 695 (1973). However, particularly where the school board has not formulated standards to guide him, academic freedom affords a teacher a certain latitude in judging whether material is suitable and relevant to his instruction. "First Amendment freedoms need breathing space to survive. . . ." N.A.A.C.P. v. Button, 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963).

These instructors did not exceed the bounds which germaneness places on protected classroom speech. The discussion and distribution of the Woodstock brochure consumed no significant amount of school time. Compare State ex rel. Wasilewski v. Bd. of School Directors, 14 Wis.2d 243, 260–261, 111 N.W.2d 198, 208–209 (1961), appeal dismissed, 370 U. S. 720, 82 S.Ct. 1574, 8 L.Ed.2d 802 (1962). Further, it was arguably relevant to the course of instruction. Sievert's class had just completed study of the history of rock music; Brubaker's was considering the construction of musical instruments. The 1969 rock music festival at Woodstock, New York had at least some significance to these subjects, significance which was perhaps more evident in April, 1970 than it is today. More importantly, however, the appropriateness of a particular classroom discussion topic cannot be gauged solely by its logical nexus to the subject matter of instruction. A teacher may be more successful with his students if he is able to relate to them in philosophy of life, and, conversely, students may profit by learning something of a teacher's views on

general subjects.[1] Academic freedom entails the exchange of ideas which promote education in its broadest sense.

The Woodstock brochure was not so offensive that its classroom use was obviously improper. The school board had not promulgated any standards against which plaintiffs could measure this type of literature to determine whether board policy forbade its use.[2] The board points out that certain conduct patently exceeds "the bounds of the recognized standards of propriety" and a particular rule giving advance notice that it is forbidden is unnecessary. *Wasilewski, supra,* 14 Wis.2d at 257, 111 N.W.2d at 206. See also *Shirck v. Thomas,* 447 F.2d 1025, 1027 (7th Cir., 1971), vacated on other grounds, 408 U.S. 940, 92 S.Ct. 2848, 33 L.Ed.2d 764 (1972). However, the material in question does not fall into this category.

First, plaintiff's experts in the field of education characterized the Woodstock pamphlet as suitable, even admirable, teaching material for eighth grade students. Whether or not this opinion be accepted, the classroom use of this work can hardly be considered "conduct, generally condemned by responsible men." In re Ruffalo, 390 U.S. 544, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968), reh. denied 391 U.S. 961, 88 S.Ct. 1833, 20 L.Ed.2d 874 (concurring opinion). Second, the brochure is not obscene in the legal sense. The use of profanity does not transform the controversial into the obscene. See Cohen v. California, 403 U.S. 15, 20, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971); Fujishima v. Board of Education, *supra* note 2, 460 F.2d at 1359 n.7. Miller v. California, 413 U.S. 15, 24, 93 S.Ct. 2607, 2615, 37 L.Ed.2d 419 (1973) described obscenity as limited to "works which, taken as a whole, appeal to the prurient interest in sex, which portray sexual conduct in a patently offensive way, and which, taken as a whole, do not have serious literary, artistic, political, or scientific value." The bulk of the pamphlet consists of inoffensive factual accounts of the Woodstock festival. Even assuming the continuing validity of the variable obscenity doctrine,[3] and making the widest allowances for the age of plaintiffs' students, neither the brochure as a whole nor the poem "Getting Together" begin to satisfy the *Miller* criteria. See *Jacobs, supra* note 2, 490 F.2d at 610.

Whether the board could constitutionally have promulgated specific rules which would have prohibited the classroom use of this literature by eighth grade students is not the issue presented. I cannot conclude that these materials are so clearly improper as to justify the mid-term discharge of an instructor who elected to use them in his teaching.

I would reverse the district court's summary judgment for defendants and remand for determination of the amount of back pay due plaintiffs as a result of their unlawful discharge.

Appendix to follow.

I fail to see how this statute afforded an instructor any guidance whatsoever in determining whether a particular work which alludes to the use of alcohol and narcotics is suitable educational material.

The board also refers to its policy no. 3547 which in effect prohibits the distribution of printed matter without its prior approval. This court has invalidated similar regulations for overbreadth. Jacobs v. Board of School Commissioners, 490 F.2d ⸱601, 604–609 (7th Cir., 1973), cert. granted, 417 U.S. 929, 94 S.Ct. 2638, 41 L.Ed.2d 232. See also Fujishima v. Board of Education, 460 F.2d 1355 (7th Cir., 1972).

1. The Supreme Court recently noted, in the context of prisoner correspondence rights, the reciprocal nature of first amendment speech rights in Procunier v. Martinez, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). Similarly, academic freedom includes both the freedom of the student to hear as well as that of the teacher to speak.

2. The board relies in part on a provision in Ill.Rev.Stat. ch. 122, § 27–10 (1969) repealed effective Oct. 1, 1973 by P.A. 78–334, § 2:
"The nature of alcoholic drinks and other narcotics and their effects on the human system shall be taught in connection with the various divisions of physiology and hygiene, as thoroughly as are other branches, in all schools under State control. . . ."

3. See, e. g., Ginsberg v. New York, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968).

APPENDIX

**BOB MAURICE (left) and MIKE WADLEIGH**

# Wadleigh and Maurice: Ready For The Moment When It Came

Most movies consist of someone looking—through a camera—at someone else, or something else. "Woodstock" consists of the young — performers and audience, together—looking at themselves. It wasn't planned that way. It came out that way because the moment had arrived.

Producer Bob Maurice and director Mike Wadleigh were ready when it came They had called together a gifted team of young cameramen and technicians. And collected a half-million worth of the finest movie equipment. When what happened started to happen, they thrust the whole assemblage straight into the heart of the Woodstock Fair. Through three great rainstorms, tides of mud, 70 hours of shooting, 81 hours of sound takes, 400,000 people, three day-and-night days of discomfort, communion and release, they caught on film and tape for all of history the unbelievable true mass experience of Bethel, N Y

Six months of slow creative agony followed. Over 315,000 feet of film (120 hours if shown straight) were reworked on new and profoundly sophisticated editing equipment, called Kellers, which allows as many as six views of the same subject to be seen at once. More important than the technical advantage is the simultaneity, as near the quick-silver shift and shimmer of life itself as a machine can yield.

Wadleigh, paired by assistant directors-supervising editors Martin Scorsese and Thelma Schoonmaker, with producer Maurice on hand to worry, rode the sea of tape and film through the Kellers. Like a group of great surfers facing in to an ocean up to now unknown. They emerged with three hours, 10 minutes of phenomenon that goes by the name of "Woodstock"

It is a movie, of course, and it is being released by a movie company, Warner Bros. It may well turn out to be a forking-point for life in America.

*Film-makers brought to Bethel, N.Y. to shoot "Woodstock" in their work-quarters near the platform. Bearded man with camera and headset, lower right, is Mike Wadleigh*

## Baez: Feelings, Not Words, Are What Matter

When Joan Baez is dealing with words, per se, she puts them in a book ("Daybreak"), or in a speech on civil rights or the peace movement. When she sings, she concerns herself with something else. "I don't care very much about where a song came from or why, or even what it says. All I care about is how it sounds and the feeling in it," she states

For her, the Woodstock Music & Art Fair was a time of great feeling. She was a few weeks away from the birth of her first child. The father, her husband, David, was in a Federal prison serving a five-year sentence for draft refusal. She sang, hauntingly, of both.

She has that uncanny power, to hold and fuse many into one with herself. And because of it she has become, since her initial professional appearance at Newport in 1959, the most significant woman in the folk field. All of her previous eleven albums for Vanguard were, and are, bestsellers.

The newest is named "David's Album." And her child is named Gabriel. Gabriel is David's cellmate in Safford Prison Farm, Arizona.

**JOAN BAEZ**

## C. S. N. & Y: Talent Can Be Singular And Plural, Too

Crosby, Stills, Nash & Young are harbingers of the new breed in combos—a second-generation super-group all of whose members are talented, experienced vocalists, musicians and writers, all of whom are splitting from the group concept.

Vocalist Graham Nash (ex-The Hollies) voices it this way: "The essential difference between us and the typical group is the commitment involved. We don't want to feel as if we have to be in a certain place at a certain time, or arrange our lives to suit anybody but ourselves If one is into something groovy, and some-

*The Feeling:*

# GETTING TOGETHER
### by Paul Williams
#### *Ex-Editor, Crawdaddy!; author, "Outlaw Blues"*

Woodstock felt like home. A place to take acid A place to make love. Felt a little like a place we'd been before, but hard to remember, like yesterday's vision, like last night's dream. But now it's all now, and it feels like we're never turning back

It was all too real to be true.

Woodstock felt like the morning news. Sun came up today.

Joy! Breakthrough!

Woodstock felt like a swell of energy, wave of elation that fills the heart and flows on over the lover beside you.

Woodstock was freedom. Don't ever forget that Don't ever settle for less.

Woodstock was simply getting together We could do it right now. Just you and me And anyone else who wants to be with us . . .

Sun up in the morning, Music in the valley People on the hill.

I remember the rain. Running and smiling. Mud and laughter Nothing to fear

It was a great storm, people on the edges were driven away; those in the center drew closer together.

We stormed and we came for days.

It was only the beginning . .

It felt like a nice place to be. Trees and meadows Garbage. Sunshine. Out in the country with half a million people. Somewhere adrift on the planet.

Happiness.

A feeling of being full

Of having something to share.

Woodstock the moment of gathering together, touching your brother, opening eyes we never knew existed, seeing a Self no soul would dream of doubting. That's me!

Oh joy overflowing, oh lover caressing, I am what I have to share, oh take me completely!

Saying it with every smile

Dream of a million lovers

Grass smoked together.

Stink of our shit, music of laughter.

Gathering together.

Bodies naked into the water, touching each other, opening hearts into greater awareness

of being together

of living on the planet

of being part of something—a movement, a motion, like a drop of water in the crest of the tide, moving together we're a big fucking wave . . !

Woodstock felt like a living organism, being inside, being a cell, music the bloodstream, energy-food overflowing through us—

It's only the beginning. Awareness is growing. It was all too true to be real, but when you feel it again you'll remember just how high we are

Old world crumbling, new world being born, Woodstock a festival of getting togther, celebration of birth, not the first and scarcely the last but every time you're born it feels like a whole new life.

And it is. What a bath! Fine feeling, emerging from warm womb into loving world, here I am, I know who I am.

Blast of cold air Makes you feel good to be alive.

"He who is not busy being born is busy dying "

"Why wait any longer for the world to begin?"

Woodstock felt like a nice place to be Peace be with you, brother, till we meet again.

thing groovier comes along, one should go and do that. We have all paid our dues . . . Now we want something different"

The Woodstock Fair was one of the earliest occasions when guitarist-vocalist David Crosby (ex-The Byrds), bassist-organist Stephen Stills and guitarist Neil Young (both ex-Buffalo Springfield) got together with Nash. It was smash Though they were pretty nervous before a live audience (so alive). But they made it What they did and said for the crowd at Bethel showed them it was possible to be both singular and plural, and come off well two ways.

**GRAHAM NASH**

# ⨎tock

**ALVIN LEE**

**JOHN SEBASTIAN**

## Ten Years After: Logical Progression, No Forced Changes

Ten Years After is a rarity—a blues-rock quartet who have made their way to recognition without sacrificing, en route, either integrity or the power of their highly individual music.

At Woodstock, they arrived unheralded Simply an English group playing what Alvin Lee, vocalist-lead guitarist, terms "blues-based rock with jazz tendencies " But their impact was instantaneous. The drums of fame began beating at once throughout the rock generation to celebrate the advent of a new combo with a genuinely unique sound

The group, whose other members are Leo Lyons on bass, Ric Lee on drums and Chick Churchill on organ, have since produced a new album, "Sssh," and are attracting immense crowds on a nationwide tour

Super-sounds or not, Ten Years After defy classification as rock musicians in the usual sense They play essentially white blues, a dynamic new-style pop music that has grown out of black blues, soul music and jazz They are trying to develop a style that is a logical progression without any forced changes.

"We don't think the objective of white blues is to imitate black musicians," says Lee. "When we do a bluesish song, it's more in style than in feeling. The feeling is relevant only to us "

### WHAT THEY SAID...

*Woodstock was beads and colors and flowers and sunshine and beautiful people.*
—John Sebastian

*This was the "Gone With The Wind" of our generation.*
—Alvin Lee

*I'm glad it rained. It was a great storm, it really was.*
—Joe Cocker

*The peace at Woodstock was just common sense. If you get excited in a crowd like that it would just snowball*
—Crosby, Stills, Nash & Young

*If it happened at Woodstock, why shouldn't it happen again?*
—Arlo Guthrie

### THE SOUND TRACK ALBUM

Atlantic Records this spring will issue on the Cotillion label the original soundtrack recording of "Woodstock." The album will consist of two LP records packaged in a deluxe box with additional material (like a poster) inside. All the key artists featured in the film will be on the soundtrack album A single, featuring Crosby, Stills, Nash & Young singing the theme song of the picture, "Woodstock '69," was released by Atlantic on March 3.

## Sebastian: Finger On the Pulse Of His Time

As a member of The Loving Spoonful, John Sebastian proved himself a top performer, singer and song-writer. Yet it is one thing to be in a group and another to go on stage and face the audience alone.

At Woodstock, Sebastian demonstrated his powers for the challenge. As he sees it, "leaving The Spoonful was a very spontaneous thing. There were a hundred little reasons, but primarily—and not only for me but for all of us—The Spoonful had lost its magic."

Today, along with solo recording and performing, he is branching out as a composer. Adding to his impressive string of record hits, he has done the scores for a Broadway show, "Jimmy Shine," and two motion pictures, "What's Up, Tiger Lily?" and "The Magic Christian."

Like a Mark Twain of pop music, Sebastian has always had a finger on the pulse-beat of his generation. Now at the halfway point between the Spoonful fame of the past and the promise of his solo future, it is appropriate that his first screen appearance is made in "Woodstock," the film that belongs to that generation.

## Cocker: Volume For Itself Just Won't Do

Joe Cocker has written few of the songs he sings. But how he sings them has put him on the expressway to eminence as the rock-blues star of his generation.

He is also different from his peers in another way—he doesn't believe in volume for volume's sake "I used to have a huge bank of amplifiers and speakers," he says, "but I got rid of them. I only use small amplifiers now."

Those small ones, plus Cocker, were enough to stand the Woodstock Festival on its head. Or its feet.

His art as a singer has gone around the world, but inside he has never gotten away from England, though he made a strenuous, and successful, effort to get away from a home town 200 miles north of London There he worked as a gas-fitter by day and sang in pubs at night He interwove prodigious native energy with a blues style frankly taken from blind Ray Charles, whom he idolizes. The going was slow, and torturous. He reached where he wanted to go. In the past year, two of his songs ("With a Little Help from My Friends" and "Delta Lady") have climbed to the Top-20 chart in Britain, and stayed

All of that pleasured him, of course, but not because of the money Loot, Cocker believes, "is just another complication . . . having to think about what you are going to do with it."

## The Meaning: WOODSTOCK IS YOU
### by Ellen Sander
*Freelance contributor, Saturday Review, Vogue, Los Angeles Free Press*

With the odds stacked mightily against a bearable future, there's a turbulent current of hope crackling through these times The way out of here comes down to a genuine love we create and follow with a yearning, painful, fierce persistence Look far enough over yonder and it's a new world coming and somehow the way up has something to do with going back to where we once belonged Joy is alive and well in rock and roll.

Everyone I know feels it. Myths are fading, minds in motion conjure joy and let it be, values come to resemble feelings more than things, there is new music and life at its best is its dance. A feeling, yes. It culminates periodically in successive bursts of pure positive energy generated by ever increasing numbers of new children together, reciprocating their music Woodstock was one of them, the biggest most beautiful one yet.

At Woodstock where it all came together, close to the earth, under the sky, breathing clean air we sustained it for three days Even the rain that threatened to stop it while challenging us to see it through was a part of it The challenge was met, the show went on, the stage was several hundred acres of mother nature. A lineup of the most star spangled, full blasting rock and roll extravagance was up on the proscenium, but the star of Woodstock was you, you who were there, you who tried to come, you who wished you had, you who heard about it and were flashed with the magnificence and monstrosity of it all.

What emerged was a glimpse of the future, a three day tribal celebration burst full blown from the heights of its fantasies and the depths of its most gruesome fears. It literally rocked the outside world

But to many here among us it was no surprise Somehow it was destined, a great leap in the continuum was upon us The energy and ingredients had been growing geometrically, countless pop events prior to Woodstock approached, even touched transcendence, but this one turned out to be the chosen moment Why then? Why there? Examining the coordinates is missing the point By luck, by magic, by sheer gumption, it happened at Woodstock.

Urgency, ecstasy, idealism, terror. That's what ticks like a time bomb inside this generation Music and massacre exist side by side in time. Woodstock was an equal and opposite reaction to the technological, social and political pressure cooker we live in Civilization has a tantrum, youth has a rock festival.

It became a three day live-in where food, shelter and joy were shared. Authority was missing in action, hundreds of thousands of young people suddenly realized they could have it any way they wanted. A choice was made; genuine peace, love and humanity prevailed It worked Joyously, profoundly, we were all touched by one another en masse for the duration of a festival after which nothing could ever be the same It became a microcosm of a once and future dream, a metaphor for a movement, a statement on all the changes we feel It was an eruption of energy so positive and logistically monumental that come what may, it stands as the best example of just how together we can be. Everyone.

JOE COCKER

*The Woodstock Festival, devoted to music and art, also became a place to fall in love. Many marriages followed from meetings here.*

996

WLSRADIO 89 abc

# wood

WADLEIGH at the KELLER editing machine

## Sabbatical Swung Wadleigh Away From Medicine to the Screen

Michael Wadleigh, director of "Woodstock," was destined for a medical career until the screen grabbed him. Or he grabbed the screen.

After studies at Ohio State, Wadleigh put in two years at Columbia Medical School, then gave himself a sabbatical during

which he studied cinematography at N.Y.U. That changed everything.

Over the last three years, he has been actively a film-maker He has 12 documentaries for N.E.T.-TV to his credit In Afghanistan, he scaled mountain peaks to put together a 60-minute special for General Electric Time-Life assigned him to range the Wyoming range for a full-length documentary. He has made short films on the careers and work of Robert Kennedy, Eugene McCarthy, Hubert Humphrey and President Richard Nixon

Though Woodstock was, as yet, not even an idea in anyone's head, Wadleigh trained himself for it through a Merv Griffin television special which won extensive acclaim for innovative camera work on such performers as Dionne Warwick and Aretha Franklin Later, he filmed Joan Baez and James Brown similarly Then came three days in August, 1969. If "Woodstock" is anything, it is pure Mike Wadleigh.

## Guthrie: Six Weeks of College Were Quite Enough

Arlo Guthrie has been singing all his life.

Born in Coney Island, New York, he attended Rocky Mountain College in Montana for just six weeks, then decided to retire from routine education and concentrate on composing and singing his own songs He has done so with considerable success.

In February, 1966, Guthrie began his professional singing career, doing club dates across the country. This was followed by a month-long concert tour of Japan with Judy Collins and the recording of his now-legendary album, "Alice's Restaurant."

His first screen appearance was in the film of the same name His second is in "Woodstock."

ARLO GUTHRIE

## Several Roads Led Maurice Into Producing

History, psychoanalysis, linguistics, anthropology and comparative religion were roads Bob Maurice investigated in search of a calling before he found his way as a producer of motion pictures There was also a detour into construction of the Belgian Village at the New York World's Fair.

Mutual friends introduced Maurice to Mike Wadleigh. They formed a partnership whose first effort was a "cinema of the future" to be built in Los Angeles. All seemed well until California put a freeway over their chosen site for the project They abandoned that notion and turned to the production of documentaries, short subjects and full-length feature films.

When the Woodstock Music & Art Fair was announced, Maurice approached several motion picture companies to finance full-scale coverage in a brilliant, offbeat way. Warner Bros gave them the money. The rest is movie history. Namely, "Woodstock."

BOB MAURICE

## Hendrix: "Free Form" Brings Gut Reactions

"Woodstock" is the vehicle for the screen debut of Jimi Hendrix For many minutes he performs the concluding number, probably the most far-out "Star Spangled Banner" ever sung, and yet uniquely fitting for an event that changed the U S scene forever.

Hendrix began in Greenwich Village, in Britain became The Experience with the support of bassist Noel Redding and drummer John "Mitch" Mitchell He describes what he does musically as "free form," and says, "We play exactly the way we feel"

What that does to an audience Janis Joplin has described like this. "He cuts across all the barriers and inhibitions that stop people from relating to each other, His actions are basic, your reactions are from the gut"

JIMI HENDRIX

(l. to r.) BARRY MELTON, COUNTRY JOE McDONALD, MARK KATNER, DOUG METZER and SANDY LORING

## Country Joe & Fish: Hard, Driving And Demanding

While most of the California rock groups were finding San Francisco the most conducive place in which to get started, one emerged in Berkley While most of the new groups catered to an audience that was hip, one was interested in a following that was political That group is Country Joe and The Fish

Country Joe and The Fish, as they appeared at rain-soaked Woodstock, is almost the same group that began as an underground band in 1965 Country Joe is still there, along with the love songs, and the drug songs, and the anti-war songs. Barry Melton is still at the guitar, but the original bassist, organist and drummer have been replaced many times The 1969-70 version of The Fish includes Mark Katner at the organ, bassist Doug Metzer and Greg Dewey at the drums.

In "Woodstock," the group perform with that super-level of energy and intensity that has become their trademark. Hard, driving and demanding, their sound is the sound of now. Many claim the honor, but Country Joe and The Fish are one group truly representative of the strange new generation of The Seventies.

FARMER MAX

Max Yasgur, until Woodstock, was only a graduate geneticist (cattle), and successful upstate-New York owner of a huge milk-farm employing 50 people. When town after town spurned the Music & Art Fair, Yasgur accepted it and gave it hospitality Now, he belongs to history—and to thousands of youngsters to whom he's known as "The Provider" or "Farmer Max." Though it was on his property, Yasgur never heard any of the music He was too busy with the social earthquake across his acres

How some of the people took the music

**stock**

## Sly: From Gospel To Social Protest For Everyone

Sly Stone, born Sylvester Stewart, began his singing career the same place most black performers got their start: in church From the age of four, he was in a family gospel group, and the strong echoes of gospel singing have become a definite part of his sound today.

While still in his teens, in the mid-Sixties, Sly was a top disc jockey in San Francisco He put together The Family Stone in 1966, after forming and disbanding groups that didn't suit him. The Family is really a family, from brother Freddie on lead guitar and sister Rosie on electric piano to cousin Larry Graham, on bass, plus his relatives, Jerry Martini on saxophone and Gregg Enrico on drums The final touch of talent is Cynthia Robinson on cornet She attended Sacramento High School and Vallejo Junior College in California with Sly

Sly has arranged, written, produced and recorded the 60-plus songs on the four albums that The Family Stone have recorded. Many of his songs have social consciousness, yet they are able to appeal to both black and white, short-haired and long-haired people of all ages "My best song is the one I'm writing at the time," he says. "I believe in absorbing everything and then letting it all hang out "

SLY

## Havens: The Future Arrived With Music

"Richie Havens," according to one writer on rock, "is a pure example of the ecstatic singer, open to love and to emotion and on fire with a glorious view of the future "

Havens has been looking to that future since he can remember. In 1962, at the height of the folk music revival, he heard Dino Valenti and Len Chandler perform in Greenwich Village. What they did inspired Havens to try, too, and decided the question of the future. For him it lay in music. As for his famous guitar playing, with that unorthodox method of "open E-tuning," he says, "I just stumbled on it 'cause nobody taught me how to play."

For a while, his performances were limited to Village haunts, where a fervent underground following supported him with contributions tossed into a basket. Since 1966 and the release of his first album, Haven's career has moved forward with startling momentum. Another album, cross-country tours and a spectacular appearance at the Woodstock Festival have only confirmed what the early Village fans said about him: "Richie Havens—beautiful!"

RICHIE HAVENS

### *WHAT THEY SAID...*

*The organization on the outskirts of Woodstock was more hectic than the non-organization in the middle, which is a lesson to be learned*

—Sly

*Three million people to me, or even half a million people, constitute just a nice, big, large, spirit.*

—Richie Havens

## Santana: To Make Love, Music Raw and Basic

Santana is one of those very popular music combos to come from San Francisco, and identified with the West Coast.

Their music is difficult to categorize. The Santana sound has been called everything from Mexicano blues—their lead singer (Carlos Santana) being a Mexican-American—to Mariachi rock, since two of their number are Latin American (Jose Areas on conga drums, trumpet and timbales, and Mike Carrabello, on conga drums). The rest of the group includes Texas-born David Brown on bass, Gregg Rolie of Seattle on keyboards and the youngest super-star drummer in the business, 19-year-old Mike Shrieve from Redwood City, California. Perhaps the best summary comes from Carlos Santana himself. "It's music to make love by—raw and basic "

To fully dig the Santana sound, one should really see the group live And this is what happened at Woodstock Santana is as much a visual experience as aural, and, not surprisingly, their screen debut is an explosive one

SANTANA

*Schematic sketch of focal area at Woodstock Festival. Recording takes were done back of the stage (Hanley Sound). Film-making group had its work quarters next door. Shooting was done at front of stage (shooting platform) Section marked "changing pit" was underneath the stage and the place where film already shot was removed.*

## Flexible People and Means Made "Woodstock" Film Possible

Beyond performances by some 30 groups and singles, and attendance by some 40-50,000 youngsters, very little more was specifically expected at the Woodstock Festival. However, there were vibrations It might turn out to be big

For whatever might develop, there was ready and waiting at Woodstock one of the most adroit and flexible movie-making set-ups ever assembled. Here are the major items brought to Bethel, N.Y., by director Mike Wadleigh and producer Bob Maurice:

Nine Eclair NPR cameras, 11 Eclair constant speed motors, 10 Eclair variable speed motors, one Auricon 16mm camera, five 9.5 to 95 zoom lenses, three Bolex cameras, three Arriflex S with constant and variable speed motors, one 25 to 250 zoom lens, one 300mm Kilfit lens, an assortment of Bolex and Arriflex lenses, 11 Spectra Pro lightmeters, six Minolta spotmeters, five body braces, one tripod with spreader, 15 battery belts, 25 changing bags, 50 camera magazines, seven Nagra sound recorders, 11 dozen D cell batteries, six 804 Senn. microphones with windscreens, five 404 Senn microphones with windscreens, eight headsets, six walkie-talkies, 60 rolls of 35mm tungsten balanced film, 315,000 feet of 16mm (six percent No 7255, forty percent No. 7242), 10 still cameras, eight cars, five motorcycles, one helicopter, three tents, one Xerox machine and one van.

In addition to Wadleigh, there were four other principal photographers, eight auxiliary photographers and five camera assistants, documentary unit coordinator, performance sound coordinator, sound mixer, sound engineer and assistant; six documentary sound-

men; assistant to the director; production executive; chief electrician; production liaison, location liaison; location production assistant and 12 location assistants, and still photographer.

The Wadleigh-Maurice contingent was divided into groups which concentrated on the performances, and groups which filmed the audience Each group was outfitted with enough supplies and equipment to let it function as an independent unit

The style of shooting, and the rule for both kinds of groups, was cine verite. A group could work—largely on its own and using primarily its own creative intuition and technical knowhow—for three-four hours. Then it was supposed to rest—or, if exhausted, to retire to certain hotel rooms reserved three miles away. The bulk of them never got there They simply worked until they literally fell over. Besides, they could not have gotten to their rooms It was the greatest jam-up in American history.

Home: haystack and wine

from warner bros.

**1000**

## ON REHEARING EN BANC

Before SWYGERT, Chief Judge, KNOCH, Senior Circuit Judge, and FAIRCHILD, CUMMINGS, PELL, STEVENS, SPRECHER and TONE, Circuit Judges.

### ORDER

On consideration of the briefs and the arguments presented at the rehearing *en banc*, the judgment of the district court is affirmed by an equally divided vote.