**Ouida DEAN**

v.

**TIMPSON INDEPENDENT SCHOOL DISTRICT et al.**

Civ. A. No. TY–77–121–CA.

United States District Court,
E. D. Texas,
Tyler Division.

Aug. 21, 1979.

Joe K. Crews and Larry Daves, Tyler, Tex., for plaintiff.

Grover Russell, Jr., Center, Tex., for defendants.

## MEMORANDUM OPINION

ROBERT M. PARKER, District Judge.

Ouida Dean brought a suit seeking equitable relief against her former employer, The Timpson Independent School District. Mrs. Dean relied upon 42 U.S.C. § 1983, the First and Fourteenth Amendments, as a basis for her cause of action. Also named as parties-defendant were School Board

members John Raines, Ross Thornton, Bruce Samford, John Perry Green, Marvin Stockman, Virgil Wedgeworth, and Superintendent R. V. Higginbotham. After hearing the testimony and reviewing the depositions, the Court entered judgment for Mrs. Dean, ordered reinstatement, and awarded back pay and attorney's fees.

In reaching its decision in this non-jury case, the Court was required to enter into uncharted territory. Cognizant of that fact as well as the fact that its action may be seen as an intrusion into an area of local control, the Court enters this memorandum opinion. Local school boards in this state are given wide discretion and authority to structure and control the course of public education within their districts. School administrators perform a task of great importance and immeasurable difficulty. But, however important or difficult their responsibilities may be, local school officials may not operate in a vacuum.

 Public school administrators must perform their duties in a manner consistent with the Constitution.[1] When school officials cease to honor their Constitutional obligations or when they act in conflict with Constitutional provisions, the mandate of the federal courts is to intervene, particularly when they are called upon to vindicate human right and civil liberties.[2]

Sixteen years ago, Justice Douglas commented upon this responsibility of the federal courts:

. . . wherever the Federal courts sit, human rights under the Federal constitution are always a proper subject for adjudication . . . .

*McNeese v. Board of Education*, 373 U.S. 668, 674 fn. 6, 83 S.Ct. 1433, 1437, 10 L.Ed.2d 662 (1963). Having established its role in the resolution of this controversy, we may proceed with an examination of the facts.

## I.

### FACTS

Ouida Dean had taught a range of subjects at Timpson High School for six years. On March 10, 1976, Mrs. Dean was teaching high school classes in Drama, Junior English, Senior English, Speech, and Psychology. In addition to teaching five classes in different subjects, Mrs. Dean made significant contributions to the school's program of extracurricular activities. During the period in question, she directed a Junior Class Play and participated in the filming and editing of a student project for the Texas Commission on the Arts and Humanities.

Mrs. Dean was a conscientious teacher. It is undisputed that she had established a professional reputation for excellence. Each witness who testified from personal knowledge of her classroom teaching credited her with effective methods, an interest in her students, and a desire to enrich the educational environment. of Timpson, Texas. Her record as a teacher at Timpson was exemplary, at least until March 10, 1976.

It was Mrs. Dean's effort to challenge and motivate critical thinking in the minds of her students which eventually brought this controversy to the Courts. In connection with the teaching of sex roles in her psychology class and interviewing techniques in her speech class, Mrs. Dean introduced, or caused to be introduced, a survey printed in *Psychology Today*. · The survey was entitled "Masculinity—What it Means to be a Man?," [3] and it admittedly dealt in part with sensitive subjects relating to sexual intercourse in an explicit fashion. Mrs. Dean had relied upon the use of another opinion survey on several occasions during

1. *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); *Epperson v. Arkansas*, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968); *Mt. Healthy City School District Dis-*

*trict Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). ·

2. See authorities cited in Note 1 and their progeny.

3. Hereinafter referred to as the "Masculinity Survey."

her tenure with the Timpson Independent School District. The other survey, which had been used several times in the classroom before March 10, 1976, had been identified at trial as the Ethics Survey.

■ This survey dealt with a number of social issues—the use of mind-altering drugs, euthanasia, artificial reproductive methods, and organ transplants to prolong life. Testimony at trial revealed that a number of Timpson residents had referred to the survey as an "Abortion Test." Judicial notice was taken of the conservative social and political climate that existed, and exists, in Timpson, Texas. Considering this conservative climate, it is not surprising that the use of the Ethics Survey had not passed without some negative feedback.

The respective positions of the Plaintiff and the Defendants conflicted on the use of the Ethics Survey. Mrs. Dean testified that Superintendent R. V. Higginbotham had asked her about the survey and that she had responded to his questions. Mrs. Dean told him that the survey was used in her classes to stimulate critical thought regarding pressing social issues. According to the Plaintiff, Superintendent Higginbotham agreed that the survey presented the issues in an objective form and encouraged the students to develop their own ideas regarding the questions. Mrs. Dean stated categorically that Mr. Higginbotham did not tell her to refrain from using the Ethics questionnaire, nor did he caution her about using similar materials in the future.

Superintendent Higginbotham and Principal Bogue had a different recollection of the system's reaction to the use of the Ethics Survey. However, it is interesting to note that Mr. Higginbotham's and Mr. Bogue's stories fail to coincide. They failed to agree on when a conference was held with Mrs. Dean, where it was held, and what she was told. Higginbotham and Bogue agreed on one element—that Mrs. Dean was told not to bring materials of a similar nature into the classroom without prior clearance by the school administration. It is important to note that there is no record of this conference. Nowhere in Mrs. Dean's personnel file is there a notation of the conference or any warning regarding future use of similar materials. No written policy ever emerged from the Board governing the use of such supplementary materials in the Timpson Independent School District schools. It is undisputed that the Board has never had any policy regarding the use of these materials, even such materials which the Board considered to be of a sensitive nature. As the fact-finder, the Court concludes that either Mrs. Dean was never issued a warning in accordance with the Defendants' own disciplinary policies or the warning was of an ambiguous or vague nature, such that a reasonably prudent person could not discern what conduct the warning sought to prevent.

In connection with the teaching of certain chapters in her psychology textbook, Mrs. Dean intended to formulate a survey regarding sex roles similar in form to the Ethics Survey. As a subscriber to *Psychology Today*, Mrs. Dean found a survey regarding male sexual identity and female perceptions regarding that identity published in the March, 1976, issue of that magazine. Mrs. Dean put the magazine aside, and retained it for the purpose of adapting the survey to her classes.[4]

Mrs. Dean never adapted the survey for classroom use, and a senior student who needed the opportunity to make up some work which she had missed due to excessive absences was ultimately charged with the responsibility of administering the survey to Mrs. Dean's classes. According to Mrs. Dean, the student was told to omit the questions which assumed that the students were married or had been sexually active. Mrs. Dean instructed the student that the exercise was optional and that the students were not required to respond to the survey. In the event they chose to participate in the exercise, any time a question was too per-

4. All witnesses agreed that it was a common practice at Timpson Independent School District to duplicate classroom materials, even for different subjects.

sonal or they did not want to respond to a particular question, for any reason, they were to write "N.A." (not applicable) in the numbered space.

It is not clear from the record what questions were actually read orally to either of Mrs. Dean's classes. There is evidence to support the conclusion that in Mrs. Dean's speech class the students never reached any questions after No. 62. In its use in the speech class, there is evidence to support the conclusion that certain of the questions up to and including No. 62 were instructed by the student to be answered "N.A." The record is less clear on what occurred in Mrs. Dean's psychology class. The same general procedure was followed, but we have no evidence as to what questions were read orally and what questions were omitted.

Two of Mrs. Dean's students in the psychology class were allowed to independently take the survey on their own without supervision. Each student was given the magazine in its entirety, i. e., the survey was not extracted from the magazine or edited in any way. At least two students, and possibly more, saw the sexually explicit questions contained in items 55 through 74 on the survey.

It was Mrs. Dean's testimony that she failed to read the article in its entirety. The survey contains 104 separate questions with multiple responses. Mrs. Dean testified that she skimmed the article and gave the student administering the survey general instructions as detailed above. On Mrs. Dean's copy of the magazine, x-marks appeared on certain questions contained in the 55–74 group. Mrs. Dean could not recall whether she or the student placed the x's on the article.

The survey was administered to both classes without any outburst, disruption, or similar conduct. The Plaintiff testified that she received no complaints from students, and that the exercise was smoothly administered. There was little or no evidence that the use of the survey caused any disruption in the school.

However, the reported use of the survey caused no small amount of disruption in the community. In Timpson, the survey was widely discussed. In the course of second and third hand accounts of what occurred on March 10, 1976, Mrs. Dean was contacted by Mr. Bogue. The principal told her that Mrs. Flournoy, a grandmother of one of Mrs. Dean's students, had made complaints regarding the survey. Mrs. Dean told Mr. Bogue that she would telephone Mrs. Flournoy and discuss the use of the survey with her. This Mrs. Dean did, and to her knowledge the matter was ended.

On or about Friday, March 19, 1976, Mrs. Dean was again questioned regarding the use of the Masculinity Survey by Mr. Bogue. On the following Monday, March 22, she was asked to resign. She refused to tender her resignation. On Friday, March 26, 1976, Mrs. Dean was relieved from duty. She was told by Superintendent Higginbotham that she was "being relieved of duty, effective immediately." Mr. Higginbotham did not allow her to complete the school day. She was allowed to return to her classroom only to get her purse, leaving all other personal belongings behind.

The testimony revealed that Mrs. Dean was greatly upset by her removal from the classroom on March 26, 1976. She remained in bed for the balance of the weekend, unable to discuss the events at any length with members of her family. There was no medical evidence introduced regarding her condition.

A special meeting of the Timpson Independent School Board was called by Superintendent Higginbotham for Tuesday, March 30, 1976. Notice of the meeting was posted in the Superintendent's office two hours in advance. Mrs. Dean did not appear at the meeting; her husband, Dr. Robert G. Dean, appeared in her behalf. Dr. Dean told the Board that Mrs. Dean was unable to be present due to her emotional state. Mrs. Dean had prepared a letter to the Board which Dr. Dean presented at the meeting and that was introduced into evidence in this proceeding.

The Board ratified the actions of Superintendent Higginbotham on March 30, 1976.[5] The stated reason for the discharge was recorded in the minutes of the meeting. They read, in part:

> The purpose of the meeting was to take action on Mrs. Ouida Dean. On March 26, 1976, Mrs. Dean was dismissed from duty as a teacher by Superintendent R. V. Higginbotham because of a survey that was presented to one of her high school classes.

## II.

### THE FIRST AMENDMENT QUESTION

One of the Defendants, Superintendent Higginbotham, testified that Mrs. Dean's use of the survey was the sole reason for her discharge. With the record that was developed at trial, the Court must concur in Mr. Higginbotham's testimony in this respect. Ouida Dean would never have been fired had she not used the Masculinity Survey in her classes on March 10, 1976.

The initial question which the Court is called upon to decide is whether or not Mrs. Dean's conduct was protected under the First Amendment. This precise question regarding a First Amendment right to academic freedom has not been answered by the Supreme Court or by the Fifth Circuit. Decisions of other Courts as well as indications by the Supreme Court support this Court's conclusion that Mrs. Dean's conduct was protected.[6]

In a loyalty oath case, Justice Brennan writing for the majority stated:

> Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment . . . .' The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.' . . The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, [rather] than through any kind of authoritative selection.'

*Keyishian v. Board of Regents*, 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 628 (1966). (citations omitted).

As reflected in Note 6, *supra*, several other courts have reached the same conclusion with regard to speech in the classroom. Therefore, the Court holds that a teacher has a constitutional right protected by the First Amendment to engage in a teaching method of his or her own choosing, even though the subject matter may be controversial or sensitive.

As Judge Johnson pointed out in his decision in *Parducci v. Rutland*, 316 F.Supp. 352, 355 (M.D.Ala.1970), a teacher's academic freedom cannot be absolute. The State, through the local school board, has a vital, if not compelling, interest in the welfare of the students. If a classroom speech has a disruptive effect on the students or interferes with discipline in the schools, then the school administration or the board may seek to control a teacher's academic freedom. *Mailloux, supra; Parducci, supra; Sterzing, supra.* In order to justify a restraint on First Amendment freedom in the schools, the disruption must reach a material or substantial degree. *Tinker, supra; Parducci, supra.*

---

5. Dr. Dean testified that one of the Board members found most of the questions in the survey offensive. Dr. Dean testified that he asked the Board member for an example of an offensive question other than one contained in items 55–74. The Board member told Dr. Dean that he found question 3 and the title offensive. Question 3 inquires into perceptions held by men and women as to when a man appears most masculine. The range of responses varies from sports activity to work activity to wooing a potential sex partner.

6. *Mailloux v. Kiley*, 448 F.2d 1242 (1st Cir. 1971) aff'g 323 F.Supp. 1387 (D.Mass.1971); *Sterzing v. Fort Bend Independent School District*, 376 F.Supp. 657 (S.D.Tex.1972) j'ment vacated on other grounds, 496 F.2d 92 (5th Cir. 1972); *Keefe v. Geanakos*, 418 F.2d 359 (1st Cir. 1969), and *Parducci v. Rutland*, 316 F.Supp. 352 (M.D.Ala.1970). But Cf. *Brubaker v. Board of Education*, 502 F.2d 973 (7th Cir. 1974).

After reviewing all the evidence, the Court holds that Mrs. Dean's use of the Masculinity Survey on March 10, 1976, did not cause a material or substantial disruption to the operation or discipline of the Timpson High School.

■ It is quite another matter to say that Mrs. Dean's survey disrupted the conservative community of Timpson, Texas. The Defendants have argued that whenever a controversial issue is presented in the schools and is upsetting to members of the community, then the presentation of the issue is materially disruptive to the system. After some study, the Court cannot accept the argument as urged by the Defendants.

■ The essence of *Epperson v. Arkansas*, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968), defeats the argument that the Defendants advance. *Epperson* teaches that a particular subject or theory may not be forbidden in the classroom simply because it offends the dominant views or beliefs of a community. The controversial subject at issue in *Epperson* was Darwin's theory of evolution. If Defendants' argument regarding community disruption was correct, evolution would never have been taught in Arkansas. Indeed, no subject which differed from the majoritarian view would ever be taught in the public schools. Every scientific advancement was at one time a new idea, and most new ideas are controversial. The process of education has been described as the shedding of dogmas. There is comfort in the security of old and familiar dogmas and, as demonstrated by the controversy that surrounded the teaching of the theory of evolution, many times the cloak of morality and even righteousness becomes intertwined with familiar values, perceptions and dogmas. To exclude a subject from the public school curriculum because it offends the community, or to discharge a teacher for objectively presenting that subject, runs counter to the spirit of the First Amendment, and poses a threat greater than the unsettling effect on the community precipitated by the students' intellectual exposure to matters that approach concepts long regarded as taboo. *Epperson, supra.*

The Court finds that on March 10, 1976, Ouida Dean engaged in an activity which was protected by the First Amendment. Mrs. Dean's protected activity was not merely a "substantial" or "motivating" factor in her discharge; it was the sole reason for her discharge. *Mt. Healthy, supra.* The Defendants have been unable to show that the same action would have been taken in regard to Mrs. Dean's employment despite the March 10, 1976, activity. Therefore, in accordance with the *Mt. Healthy* standard, the Court holds that the action of the Timpson Independent School District in discharging Mrs. Dean violated the First Amendment.

### III.

### THE FOURTEENTH AMENDMENT AND THE VAGUENESS DOCTRINE

■ There is yet another aspect of the case which requires further comment. At the outset, the Court would note that at this juncture, it is not dealing with Mrs. Dean's procedural due process rights to a hearing or notice of the charges against her. While the Defendants failed to afford her these rights, The Court cannot grant her any relief.[7] *Burt v. Abel*, 585 F.2d 613 (4th Cir. 1978). What must be answered in connection with the facts of this case and the insubordination claim of the Defendants is whether or not Mrs. Dean had a right to prior notice that the conduct for which she was punished was prohibited. *Parducci*, 357.

■ Plaintiff has correctly noted that punitive governmental action in the absence

---

7. During the course of the litigation, the Plaintiff waived all claims for legal relief and proceeded in equity. It is obvious from the papers in the case that Mrs. Dean's waiver was based upon a desire to avoid a jury trial. This decision, irrespective of its tactical advantages, has foreclosed the recovery of any money damages for the denial of procedural protections. *Carey v. Piphus*, 435 U.S. 247, 266, 267, 98 S.Ct. 1042, 1053, 1054, 55 L.Ed.2d 252 (1978).

of a duly promulgated rule proscribing the conduct sought to be punished violates the due process clause of the Fourteenth Amendment. *Connally v. General Construction Company,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). A fundamental precept of our democratic society is that a citizen may only be punished by the rule of law and not by the rule of men. *Parducci, supra.* In this situation the discharge of Ouida Dean for conduct which was not prohibited by an official Timpson Independent School District policy violated her right to due process of the laws. *Parducci, supra.*

 If the conference regarding Mrs. Dean's use of the ethics survey could be construed as an official policy which would have restricted her use of the Masculinity Survey, then the Court would be faced with a different question. If the Court takes Mr. Bogue and Mr. Higginbotham at their word and disregards the testimony of Mrs. Dean, it would, nevertheless, reach the same result. Whatever restriction that might have been placed on Mrs. Dean in the course of a conversation would be void for vagueness.

Governmental regulation of First Amendment activities has traditionally been required to be precise. *NAACP v. Button,* 371 U.S. 415, 432, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). An offhand comment to Mrs. Dean, the meaning of which was likely to be vague or ambiguous, cannot pass Constitutional muster:

> Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity.

*Id.,* 433, 83 S.Ct., at 338.

At best, Mr. Higginbotham's warning to Mrs. Dean was not to bring material like the Ethics Survey into the classroom without seeing him first. Such a warning, if it was indeed given, would not give a reasonably prudent person knowledge of what conduct it sought to prohibit. The alleged warning, if there was one, could have a number of logical meanings. It could have meant not to present material which dealt with mind-altering drugs or euthanasia. In any case, such a warning would not have put Mrs. Dean on notice regarding the use of the Masculinity Survey. The oral warning, if given, is not a narrowly specific regulation which the vagueness doctrine requires.

Therefore, the Court enters alternative findings on the issue of warning. First, the Court is persuaded and finds that Mrs. Dean was never warned about the use of supplementary materials such as the Masculinity Survey. Second, the Court holds that even if such a warning had been given, said warning would be void for vagueness.

## IV.

## THE REMEDY

In accordance with the Court's preliminary ruling from the Bench, the Timpson Independent School District is ORDERED to reinstate Mrs. Dean to her former position. Reinstatement is ORDERED to be in effect at the outset of the 1979–1980 school term. Back pay and attorney's fees are also awarded as part of the decree in equity.

 Defendants have requested that the Court offset Mrs. Dean's back pay award by an amount that she reasonably could have earned if she had sought employment in a neighboring school district.[8] In support of this position, the Defendants have relied upon *Guerra v. Roma Independent School District,* 444 F.Supp. 812, 822 (S.D.Tex.1977), requiring an offset for a Plaintiff's unreasonable failure to secure other teaching employment. After diligent search, the Court is unable to find a black-

---

8. In an effort to meet its burden of proof that Plaintiff could have mitigated her damages by securing other similar employment if she had only looked for it, the Defendants deposed 8 superintendents in surrounding towns. Arguably, the taking of these depositions and the disclosure of the facts of MRS. DEAN'S discharge effectively foreclosed the possibility of her securing employment in these districts at least after the date of the depositions. The depositions were taken in the fall of 1977.

letter rule setting a formula for the computation of a back pay award. Perhaps the absence of a rule is explained by the nature of the remedy; back pay is an integral part of the equitable remedy of reinstatement. *National Labor Relations Board v. Jones & Laughlin Steel Corporation,* 301 U.S. 1, 48, 57 S.Ct. 615, 629, 81 L.Ed. 893 (1937); *Harkless v. Sweeney Independent School District,* 427 F.2d 319, 324 (5th Cir. 1970), cert. denied, 400 U.S. 991, 91 S.Ct. 451, 27 L.Ed.2d 439 (1971); *Moore v. Tangipahoa Parish School Board,* 594 F.2d 489, 495 (5th Cir. 1979).

Equitable remedies vest greater discretion in the Court than do their legal counterparts. *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). In *Guerra,* Judge Gee applied the mitigation by what could have been earned doctrine without a single citation in support. *Id.,* 822. He may have sought to do this in the legitimate exercise of equitable discretion, i. e., "equity will follow law where equities are equal." 2 J. Pomeroy, A Treatise on Equity Jurisprudence §§ 416, 417 (5th ed. S. Symons, 1941). But, for whatever reason Judge Gee imposed mitigation, this Court is not bound to follow his lead.

The decisional law in this circuit, as well as in other circuits, lends equal support to a computation of back pay offset by actual earnings. *Harkless, supra; Gieringer v. Center School District No. 58,* 477 F.2d 1164 (8th Cir. 1973), cert. denied, 414 U.S. 832, 94 S.Ct. 165, 38 L.Ed.2d 66 (1974); *Cox v. Northern Virginia Transportation Commission,* 551 F.2d 555 (4th Cir. 1976). The Fifth Circuit's language in *Harkless* reveals the reason behind the rule:

> Section 1983 was designed to provide a comprehensive remedy for the deprivation of federal constitutional and statutory rights. The prayer for back pay is not a claim for damages, but is an integral part of the equitable remedy of reinstatement. Reinstatement involves a return of the plaintiffs to the positions they held before the alleged unconstitutional failure to renew their contracts. An inextric-

able part of the restoration to prior status is the payment of back wages properly due and owing to the plaintiffs, *diminished by their earnings, if any, in the interim.*

*Id.,* 324. (Emphasis supplied.)

Therefore, the Court awards Ouida Dean back pay in the amount of FORTY–ONE THOUSAND ONE HUNDRED EIGHTY–THREE DOLLARS AND FORTY–TWO CENTS ($41,183.42), an amount which represents the total amount of earnings and retirement she would have received, less the amount of her actual interim earnings at Angelina College.

## V.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

In accordance with the foregoing, the Court enters the following supplementary and specific findings of fact and conclusions of law:

1. In the use of the Masculinity Survey on March 10, 1976, Ouida Dean acted in good faith.

2. On March 26, 1976, Superintendent R. V. Higginbotham failed to follow the written termination procedures as prescribed by the Timpson Independent School District.

3. Superintendent R. V. Higginbotham failed to act in good faith in the discharge of Mrs. Dean.

4. Mrs. Dean did not waive her right to procedural due process by her failure to appear at the March 30, 1976, Board Meeting.

5. Superintendent R. V. Higginbotham failed to post adequate notice in accordance with the Texas Open Meetings Act, in connection with the time and manner of posting the notice of the March 30, 1976, meeting.

6. The Timpson Independent School District acted officially to discharge Mrs. Ouida Dean on March 30, 1976, by a vote of its school board.

7. The individual school board members acted on a good faith, although mistaken, belief that Ouida Dean had been insubordi-

nate in connection with the presentation of the Masculinity Survey.

8. The Timpson Independent School District and R. V. Higginbotham will be jointly and severally liable for the back-pay award.

9. Mrs. Dean's discharge violation her First Amendment rights, for which relief is granted.

10. Mrs. Dean's discharge violated her Fourteenth Amendment rights to substantive due process, for which relief is granted.

11. Mrs. Dean's discharge violated her Fourteenth Amendment rights to a hearing and notice of the charges against her, for which no relief is granted by reason of Plaintiff's waiver of legal damages.

12. Reinstatement is ORDERED, effective immediately.

13. Back pay is awarded in the amount of FORTY–ONE THOUSAND ONE HUNDRED EIGHTY–THREE DOLLARS AND FORTY–TWO CENTS ($41,183.42).

14. Attorney's fees will be granted to the Plaintiff's attorneys, Mr. Larry Daves and Mr. Joe K. Crews, in an amount to be determined after the submission of an appropriate motion and supporting affidavits.