Georgine KRIZEK, Plaintiff,

v.

The BOARD OF EDUCATION OF CICERO–STICKNEY TOWNSHIP HIGH SCHOOL DISTRICT NO. 201, COOK COUNTY, ILLINOIS; Edmund R. Parpart, Individually and as Superintendent of Schools of District 201; D.F. Ciner, Individually and as Principal of J. Sterling Morton High School, West Campus; John Pellegrini, Frank Chobak, Richard M. Wiedenhoeft, Joanne Ertolacci, Dennis R. Markvart, George S. Schvach, and Carole Walsh, Individually and in their official capacities as Members of the Board of Education of District 201, Cook County, Illinois, Defendants.

No. 88 C 6753.

United States District Court, N.D. Illinois, E.D.

April 24, 1989.

Peggy A. Hillman, Law Offices of Peggy A. Hillman, Chicago, Ill., for plaintiff.

Thomas J. Piskowski, R. Theodore Clark, Jr., Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., for defendants.

George E. Riseborough, Daniel P. Field, John W. Norris, Brydges, Riseborough, Morris, Franke & Miller, Chicago, Ill., for J. Sterling Morton High School Dist. No. 201.

## ORDER

NORGLE, District Judge.

Before the court is plaintiff's motion for a preliminary injunction. Plaintiff moves to enjoin her former employer's decision not to renew her employment contract. For the following reasons, the motion is denied.

## FACTS

The following facts are undisputed. Plaintiff, Georgine Krizek, was a non-tenured English teacher at Morton High School's West Campus in Berwyn, Illinois. She had previously been a tenured teacher at another school, but after changing jobs was hired as a non-tenured teacher under a one year employment contract which neither employer nor employee was obligated to renew. The contract was completed and not renewed.

During the Fall Semester, in 1987, Mrs. Krizek showed her class of third year high school students the film "About Last Night" ("The film"). The film is two hours long. The purpose of showing the film was

to present it as a modern day parallel to Thornton Wilder's play "Our Town." The students were told that if they or their parents might be offended by the film, the students would be excused from viewing the film. Mrs. Krizek did not communicate directly with the parents, and the record is silent as to how many students even mentioned the film to their parents.

The court viewed the film *in camera*. The film was given an "R" rating (persons under 17 years of age not admitted without parent or guardian) by the Motion Pictures Association. The film is about an handsome young man who meets an attractive young woman at a single's bar. The two go home to his apartment and sleep together. The next morning, the young woman begins to leave, apparently believing that the encounter was a one night stand. However, the young man asks to see her again, and the two develop an ongoing relationship. The relationship lacks depth, in that the two do not share their feelings with each other or communicate well; the relationship is based on mutual physical attraction. Eventually, the woman moves in with the man, although they are unmarried. As the woman urges marriage, the man finds himself unwilling to accept commitment, and ends the relationship. Later, he decides that he wants to begin seeing her again. In the end, the two discuss the mistakes they made and the viewer is left with the implication that the relationship will resume in some form. The film also contains subplots involving the two main characters' best friends; a rowdy young man and a cynical young woman.

The film contains a great deal of vulgarity and sexually explicit scenes. There are numerous scenes depicting the couple engaging in sexual intercourse, in which bare breasts and buttocks are seen. One particularly explicit scene shows the couple having intercourse in a bathtub filled with sudsy water. The vulgarity consists of numerous uses of "swear words," and frequent explicit sexual references. For example, the film begins with the main male character having the following conversation with his best friend:

"1 So, tell me.

"2 What?

"1 About last night.

"2 Are you kiddin' me?

"1 Yeah.

"2 Are you fuckin' kiddin' me?

"1 Yeah.

"2 Are you pullin' my leg?

"1 So?

"2 So tits out to here, so.

"1 Here's so.

"2 Yeah?

"1 Yeah.

"2 Twenty couple of years old.

"1 You got to be foolin'.

"2 No.

"1 You devil.

"2 What, you think she hadn't been around?

"1 Yeah.

"2 Hadn't gone the route?

"1 She knew the route, didn't she?

"2 Are you fuckin' kiddin' me?

"2 Yeah.

"1 She wrote the route.

"1 No shit.

"2 So, tell me.

"1 So, okay, so where am I?

"2 So, you're probably at the pancake house.

"1 So, okay, I'm over at the pancake house. Who walks in over to the cash register but this chick.

"2 Right.

"1 That 19, 20–year old chick.

"2 Who we're talking about.

"1 She wants to buy a pack of Viceroys.

"2 Oh, I can believe it.

"1 Gets the smokes and does this number about how she forgot her purse up in her room.

"2 Up in her room?

"1 Yeah.

"2 Was she a pro?

"1 At that age?

"2 Yeah.

"1 At this point, we don't know. So, down we sit. We get to talking this, that, blah, blah, blah, and it's, 'Come up to my room, and I'll pay you back for the smokes.'

"2 No.

"1 Yeah.

"2 You're shittin' me.

"1 I'm tellin' ya.

"2 And was she a pro?

"1 At this point, we don't know. But, up we go, and it's, 'Sit down. You want a drink?'

'Well, what do you got?'

'Bourbon.'

'Fine.'

"And then what shot does she up and pull.

"A, she says, 'I think I want to take a shower.'

"2 No!

"1 Yeah, and B, she says, 'Then let's fuck.'

"2 She said that?

"1 What did I just tell you?

"2 ___ Was she a pro?

"1 At this point, we don't know. So anyway, I do say, 'I'll join you in the shower, if you have no objection.'

"2 Of course.

"1 So, into the old shower we go. Does this broad have a body?

"2 Yeah!

"1 Are you kiddin' me?

"2 So, tell me.

"1 The tits.

"2 Yeah.

"1 The legs.

"2 The ass?

"1 Are you fuckin' foolin' me? The ass on this broad?

"2 Young ass?

"1 Well, yeah, young broad, young ass.

"2 Right.

"1 So, anyway, we get out, towelling each other off in his or her full glory.

"2 Yeah.

"1 But while we're towelling off, I flick the towel at her, very playfully like, and by accident, it catches her a good one on the ass, 'Whack,' we got this big red mark.

"2 No.

"1 Well, I'm all sorry and so forth. Well, what does this broad do, but let out a squeal of pleasure relief that would fucking kill a horse.

"2 No.

"1 So, what the Hell, I'm liberal, I pick up a chair, and I heave it at her.

"2 Draw blood?

"1 At this point, no.

"Well, what is she saying? 'Wait a minute.' She crawls under the bed, pulls out this suitcase from under the bed, from out of the suitcase comes this World War II flack suit.

"2 _____.

"1 Sure. Zip, zip, zip, she get into the flack suit; we get down in the bed.

"2 What were you doing?

"1 We're fucking.

"2 But she's in the flack suit.

"1 Right.

"2 Well, how do you get in?

"1 Well, she leaves the zipper open.

"2 Right, right.

"1 But the shot is, every 30 seconds or so, she wants me to go 'Boom' at the top of my lungs.

"2 At her?

"1 No. Just, in general.

"So, we're humpin' and pumpin' and greasin' the old flack suit, every once in a while I go 'Boom,' and in the middle of everything, she slithers over to the side of the bed, turns on a little Sony tape recorder.

"2 Ah hah!

"1 Well, wait, wait, wait, I don't know what the shot is, right? All of sudden, I

hear coming out of the tape recorder, 'Ratatatatat, ka pow, ka pow, ahhh ahhh ahhh ahhh, ka pow.'

"So, fine, I'm pumpin' away, the tape recorder is making airplane noises, every once in a while I go 'Boom,' and the broad in the bed starts going crazy. Right? She's moanin' and groanin', and I'm humpin' and pumpin'. She's screaming, 'Red Dog, we're under Red Dog Squadron, right?' All of a sudden, she screams, 'Wait a minute.' Right? She leans in the bed, pulls out a five-gallon gerry can, opens it up. It's full of gasoline. She splashes it all over the walls, whips a fuckin' Zippo lighter out of her flack suit, an 'Whoosh,' the whole room goes up in flames, right? So, the tape recorder is going 'Ratatatat,' the room is full of smoke. Right? The broad jumps back in the bed, and she screams, 'Now, give it to me now, for the luvva Christ!'

"So, I look at the broad, and I figure, fuck this nonsense. One, two, six, I'm in the hall, strugglin' in my shorts. Make it to the elevator. Whole place is filled with smoke. Elevator arrives. The whole hall's filled with firemen.

"You know, those fuckin' firemen make out like bandits.

"2 Nobody does it normally any more.

"1 Oh, it's these young broads, Danny. They don't know what the fuck they want.

"2 Do you thing she was a pro?

"1 A pro, Dan,—

"2 Yeah!

"1 A pro is how you think of yourself. See my point?

"2 Right.

"3 Come on, you scumbags, last inning."

\* \* \* \* \* \*

On Thursday, April 14, 1988, more than four months after Mrs. Krizek showed the film to her class, a parent of one of the students in the class telephoned W.D. Ritis, Dean of Instruction at Morton West High School ("the Dean") to complain about the showing of the film, and about the showing of two other films.[1]

At this point, the parties' versions of what occurred diverge. Defendants allege that the Dean met that day with Mrs. Krizek to discuss the parent's complaint, and she told him that she had not shown "About Last Night." The Dean investigated the situation, and determined that Mrs. Krizek had lied to him, having in fact shown the film. The Dean confronted plaintiff with his findings on Monday, April 18, 1988, and plaintiff said that the Dean had misunderstood her, that she had shown the film the previous semester, and that she did not think it relevant. The Dean discussed the matter with Don Ciner, the school principal ("the Principal"). On April 19, 1988, Mrs. Krizek met with the Dean and the Principal, and the Principal stated that he would recommend to the Board of Education that plaintiff not be hired for the next year. Defendants further allege that plaintiff called the student whose parent earlier complained out of class and told the student that she had caused the loss of plaintiff's job.

Mrs. Krizek offers a different version of events subsequent to the parent's complaint. She states that her talk with the Dean on April 14, 1988 appeared to her as a casual one, and that she did not realize he was asking about "About Last Night;" she had shown that film the previous semester, and she thought they were discussing films shown the present semester. She also alleges that she did not call the student whose mother complained out of class, but rather talked to her personally after class, asking the student to explain why the parent had waited 19 or 20 weeks before complaining. Plaintiff states that the student said she told her mother of the film only recently because she felt she had received a grade she did not deserve. Plaintiff states that she asked why she received no complaint about the grade, received no answer, and then said this has caused a lot of grief and cost her her job. The record is silent as to how, if at all, the showing of

---

**1.** These other films were rated "PG–13". There is no indication in the record that the showing of these films was related to the decision not to rehire plaintiff.

the movie was related to the student's overall performance and the grade given by the teacher.

It is undisputed that the Principal gave three reasons for recommending that plaintiff not be rehired: her use of R-rated materials unrelated to the curriculum, her incomplete response to the investigation of the parent's complaint, and her harassment of the student whose mother complained. It is also undisputed that the Principal made his decision to recommend that no new contract be made with Mrs. Krizek before her conversation with the student whose parent had complained. Apparently, Mrs. Krizek remained until the end of the school year, but was not rehired for the following school year.

Finally, there is an issue as to whether teachers were required to obtain prior approval before showing films, although the evidence seems to indicate the absence of any such rule. Moreover, it is undisputed that there existed no particular proscription against showing movies rated R or worse.[2]

## DISCUSSION

In order to grant a preliminary injunction, a court must find: 1) the plaintiff has at least a reasonable likelihood of success on the merits; 2) the plaintiff has no adequate remedy at law and will be irreparably harmed if the injunction does not issue; 3) the threatened injury to the plaintiff outweighs the threatened harm the injunction may inflict on the defendants; and 4) the granting of a preliminary injunction will not disserve the public interest. *Adams v. Attorney Registration and Disciplinary Comm'n*, 801 F.2d 968, 971 (7th Cir.1986), *citing Fox Valley Harvestore, Inc. v. A.O. Smith Harvestore Products, Inc.*, 545 F.2d 1096, 1097 (7th Cir.1976); *see also Roland Machinery Co. v. Dresser Industries*, 749 F.2d 380, 386–89 (7th Cir. 1984). Plaintiff has the burden of proving each of these factors. *Roland v. Air Line*

*Employees Ass'n*, 753 F.2d 1385, 1392 (7th Cir.1985).

Of these factors, the likelihood of success generally weighs most heavily in a court's decision. The Seventh Circuit, in *O'Connor v. Board of Education*, 645 F.2d 578, 580 (7th Cir.), *cert. denied*, 454 U.S. 1084, 102 S.Ct. 641, 70 L.Ed.2d 619 (1981), stated, "[t]he likelihood of success factor serves as a threshold requirement. ... if this factor is unsatisfied, and if the plaintiff has not shown irreparable injury, the court need go no further in denying the preliminary injunction." On the other hand, a showing of a likelihood of success is strong evidence an injunction should issue. "The more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor." *Roland Machinery*, 749 F.2d at 387. Likelihood of success on the merits has been interpreted as a low threshold; it is enough that a plaintiff demonstrate that her chances are more than negligible. *Id.*

■ Plaintiff's case centers around her allegation that the decision not to make a new contract with her violated her rights under the First Amendment. The First Amendment protects a probationary teacher as well as a tenured teacher. *Perry v. Sinderman*, 408 U.S. 593, 596, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972). Thus, even though defendants could have decided not to renew Mrs. Krizek's contract at will, they could not refuse to renew her contract in retaliation for her exercise of her First Amendment rights. *Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274, 283–84, 97 S.Ct. 568, 574–75, 50 L.Ed. 2d 471 (1977). Moreover, if defendants acted based on both permissible and impermissible motives, Mrs. Krizek would be entitled to judgment if the impermissible motive was a substantial factor in the decision, and defendants are unable to demon-

---

2. The school also has a rule that "controversial issues should be presented ... within the limits of professional discretion and propriety." The court regards such "catch-all" rules as the same as no rule at all, for purposes of this motion. A rule requiring teachers to "use only materials appropriate for the classroom" offers no guidance to a teacher as to what materials are appropriate, while even in the absence of such a rule, inappropriate materials should not be used.

strate that they would not have entered into another contract with plaintiff even if the incident in question had not taken place. *Id.* at 285–86, 97 S.Ct. at 575. Therefore, to prevail in this action, plaintiff would have to demonstrate two things: that her showing the film was a substantial factor in the decision not to renew her employment contract, and that the failure to renew her contract for showing the film was a violation of her First Amendment rights.

The first issue is easily resolved in plaintiff's favor. Plaintiff's showing of the film is stated as one of three factors in the decision not to renew the contract. Moreover, one of these factors, the alleged harassment of a student, occurred after plaintiff was told she would not be rehired. Therefore, plaintiff has a substantial likelihood of demonstrating that her showing the film was a substantial factor in the decision not to rehire her. Furthermore, it is unlikely that defendants will be able to demonstrate that they would not have rehired plaintiff but for her showing of the film, *see id.,* as the other two stated reasons for not rehiring plaintiff would not have occurred had plaintiff not showed the film.

The second issue is much more complex, and merits extended discussion. It is beyond dispute that, to some extent, the First Amendment protects teachers' expression in the classroom.

> Our nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom.

*Keyishian v. Board of Regents,* 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967).

This protection is not, for the most part, for the benefit of a teacher. As a general rule, employers are free to restrict the expression of employees in the conduct of their work. For example, a newspaper editor may order a reporter not to write the article that the reporter wants to write. The editor may tell the reporter "if you want to express a different view, do it on your own time."[3]

■ Rather, the protection is primarily for the benefit of the student, and as a result, society in general. In a sense, it protects the student's "right to hear." *See Virginia Pharmacy Board v. Virginia Citizens Consumer Council,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976); *Zykan v. Warsaw Community School Corp.,* 631 F.2d 1300, 1304 (7th Cir.1980). *Minarcini v. Strongsville City School Dist.,* 541 F.2d 577, 582 (6th Cir.1976). Public schools perform a vital function in our society. That function has two key aspects. First, a public school system strives to develop inquisitive minds and independent thought. *See Academic Freedom in Public Schools: the Right to Teach,* 48 New York University Law Review 1176, 1189 (1973). Second, a public school system provides intellectual and moral guidance, and transmits the mores of the community. *Zykan,* 631 F.2d at 1305. The second function justifies the imposition of limitations on teachers' classroom expression. However, the first function cannot be achieved unless the individual teachers are given some measure of academic freedom. Therefore, the limitations placed on teachers' expression must themselves be limited. Application of the First Amendment to classroom settings requires the courts to balance these two functions, and set the parameters for how far schools may go in restricting teachers' expression in the classroom.

There are two types of cases involving teachers' expression in the classroom. First, there are cases involving curriculum content rules promulgated by the school administration and challenged by teachers. Second, there are cases where a teacher is disciplined for expression in the classroom, despite the fact that the expression in ques-

---

3. However, an employer's right to restrict an employee's expression outside the workplace is very limited. *See, e.g., Pickering,* 341 U.S. at 568, 88 S.Ct. at 1734; *Thompson v. Board of Education,* 711 F.Supp. 394 (N.D.Ill.1989).

tion violated no specific rule. The case before the court is of the latter variety. Nevertheless, a brief discussion of the former is essential for purposes of comparison and an analytical framework.

 The courts have stated that, as a general rule, a school administration may establish the curricular contents of a course. *See, e.g., Clark v. Holmes*, 474 F.2d 928 (7th Cir.1972). In particular, in a public school system, where the state pays the costs of the education, it is legitimate for the curriculum of the school district to reflect the value system and collective will of those whose children are being educated. *Cary v. Board of Education*, 598 F.2d 535, 543 (10th Cir.1979). Consequently, the cases involving challenges to school imposed restrictions on the content of courses can be characterized as being deferential to the judgment of the school administrators, generally upholding such restrictions. *See Clark*, 474 F.2d 928 (restrictions placed on teacher by university upheld); *Zykan*, 631 F.2d 1300 (high school administration's removal of certain books from English course and school library upheld against students' challenge);[4] *Carey*, 598 F.2d 535 (high school board of education's prohibition of assignment of ten books upheld); *cf. Epperson v. Arkansas*, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968) (striking down Arkansas anti-evolution statute, but not due to violation of free speech, but rather due to violation of Establishment of Religion Clause).

Through these cases, a standard for balancing the school's right to control the curriculum and the teacher's right to expression in the classroom has evolved. Until relatively recently, no clear standard had been articulated. For example, in *Clark*, the Seventh Circuit stated that "certain legitimate interests of the State may limit a teacher's right to say what he pleases." 474 F.2d at 931, *citing Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Thus, the court did not quite state that if a challenged restric-

tion serves a legitimate state interest, it will be upheld. The word "may" acts as a qualifier, and the court did not articulate the boundaries of what are "certain legitimate interests." In *Carey*, the Tenth Circuit stated that suppression of opinions or censorship "should be tolerated only where there is a legitimate interest of the state which can be said to require priority." 598 F.2d at 543. Moreover, the court stated that when teaching high school juniors and seniors, teachers "cannot be made to simply read from a script prepared or approved by the board." *Id.* Clearly, it was important to the court that the school's restriction did not exclude any particular type of thinking and did not limit the teacher to narrowly prescribed materials; 1275 titles had been approved for the three courses in question, and the dispute was over 10 books not approved. *Id.* at 544. However, the court did not articulate how great the legitimate state interest must be to "have priority."

Through recent decisions, a clearer standard has emerged. In *Zykan*, the Seventh Circuit stated that "complaints filed by secondary school students to contest the educational decisions of local authorities are sometimes cognizable but generally must cross a relatively high threshold before entering upon the field of a constitutional claim ... [N]othing in the Constitution permits the courts to interfere with local discretion until local authorities begin to substitute rigid and exclusive indoctrination for the right to make pedagogic choices regarding matters of legitimate dispute." 631 F.2d at 1306. The court went on to deny the plaintiffs' claim because they failed to demonstrate a "flagrant abuse of discretion." *Id.* Thus, the Seventh Circuit has articulated and explained a "flagrant abuse of discretion" standard of review.

More recently, the Supreme Court stated "educators do not offend the the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expression so

---

4. The fact that the challenge was brought by students rather than a teacher is of little doctrinal relevance, because the focus of the First Amendment issue is freedom of expression for the benefit of the students and society as a whole.

long as their actions are reasonably related to legitimate pedagogical concerns." *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 108 S.Ct. 562, 570–71, 98 L.Ed.2d 592 (1988). *Kuhlmeier* can be factually distinguished from the present case, so it does not necessarily follow that the standard stated therein applies to a school administration's restrictions on the content of classroom materials. However, one court has already applied the standard articulated in *Kuhlmeier* to review of a school's removal from the curriculum of a textbook it deemed sexually explicit and vulgar. *See Virgil v. School Board*, 677 F.Supp. 1547, 1551 (M.D.Fla.1988) *aff'd*, 862 F.2d 1517 (11th Cir.1989). The court agrees with that application, and finds that the *Kuhlmeier* standard, which blends well with the standard previously articulated in this circuit, applies to challenges against school administration rules regarding curriculum contents.

█ Applying this standard, the court has no doubt that the school administration, had it chosen to so do, could have forbidden the showing of the film "About Last Night." Reasonable people could disagree about whether the film is appropriate classroom viewing for 16–17 year old students. On one hand, the film develops a number of important themes, such as that developing a physical relationship is very easy, but developing a meaningful relationship requires maturity. Also, the film depicts believable characters who are young adults living in Chicago, something many of Mrs. Krizek's students will be in a couple of years. Consequently, the film is rich with issues for class discussion.

On the other hand, the school has a "legitimate concern" over the display of vulgarity and sexual scenes to students in a public school system. The explicit sexual scenes, frequent vulgarity, and explicit references to sexual acts are such that a reasonable person could find the movie inappropriate for high school students in their third year. Moreover, while the "R-rating" of the film is binding neither on the court nor on the school, as the rating is made by a private organization, it is another indica-

tion that reasonable people could determine that the students, who are at the edge of the "17 or over" requirement, should not be viewing the movie at all. Furthermore, the fact that plaintiff told the students that they would be excused if they or their parents found the film offensive indicates that she was aware that the students and parents could reasonably be offended by the contents of the movie. Because reasonable people could differ on this point, the school could have made the "pedagogic choice" that the movie was inappropriate for the classroom, given the age and maturity of the students, and the contents and quality of the film. Thus, for the Principal to find that the film's vulgarity and sexuality outweighed its usefulness as a teaching tool would not be a "flagrant abuse of discretion" by him.

█ If the school had banned the film, the teacher would have had no First Amendment right to show the film because the school's decision was within its right to control the curriculum. If she had shown the film anyway, the school could have legitimately fired her; the reason for the non-renewal would not have been for exercising First Amendment rights, but rather for disobeying a legitimate school rule. However, this is not a case about a teacher's refusal to obey a school administration's order not to show a particular film. The question here is related, but different: whether the school's decision not to enter into a new contract of employment with Mrs. Krizek due to her showing of the film, even though there was no rule against that showing, violated her First Amendment rights. It is to that question which we now turn.

Research unearths no generally accepted standard for when it is appropriate for a school to fire a teacher for classroom conduct not prohibited by any advance restriction, but deemed inappropriate by the school after the fact. It is useful to review the cases which have faced this issue and consider the utility of the standards of review stated in those cases.

In the majority of the cases in which no advance restriction was violated, the courts

have found violations of First Amendment rights. In *Kingsville Independent School District v. Cooper*, 611 F.2d 1109 (5th Cir. 1980), a non-tenured high school teacher used a role-playing simulation to teach the history of the post–American Civil War Reconstruction period. The school decided not to renew her contract because the school received numerous complaints about the controversial nature of the simulation. The court held that the simulation was protected speech, and the discharge "cannot be upheld unless the discussions clearly overbalance her usefulness as an instructor." *Id.* at 1113 (citation omitted). This court does not dispute the outcome of *Cooper*, but finds the standard stated therein too restrictive of the school's discretion. That standard seems to accord deference to the teacher's judgment as to the propriety of classroom material rather than to the school's. Yet, as is explained above, the courts have acknowledged that school administrations have primary responsibility for determining what is appropriate for the classroom.

In *Mailloux v. Kiley*, 323 F.Supp. 1387 (D.Mass.1971) *aff'd*, 448 F.2d 1242 (1st Cir. 1971) (affirming the outcome without stating an agreed upon rule), a high school teacher wrote the word "fuck" on the blackboard, asked a student what the word meant, and explained that the definition, "sexual intercourse," is not a taboo word in our culture, but the word on the blackboard is. The teacher did this to illustrate that to some extent a society and its ways are illustrated by its taboo words. This discussion was to help explain the meaning of a book legitimately assigned to the students. The district court found that the case involved "the use of teaching methods which divide professional opinion." *Id.* at 1390. The court found that in such a case "the state may suspend or discharge the teacher for using that method but it may not resort to such drastic sanctions unless the state proves he was put on notice either by a regulation or otherwise that he should not use that method." *Id.* at 1392. The district court found that no such warning had been given, and therefore ordered the defendants to re-employ the plaintiff. Thus,

the district court's standard seems to be that a school may never fire a teacher "after the fact" for poor judgment in choice of teaching materials. *See also Sterzing v. Fort Bend Independent School District*, 376 F.Supp. 657, 662 (S.D. Tex.1972) (teacher has procedural right not to be discharged by use of a teaching method not proscribed in advance), *vacated on other grounds*, 496 F.2d 92 (5th Cir.1974).

The court rejects this standard as too restrictive of administrators for two reasons. First, it would be impossible for a school to proscribe every imaginable inappropriate material. Second, schools should not be encouraged to attempt to do so. Any chilling effect of the threat of termination could be outweighed by the constriction resulting from a maze of regulations on what may and may not be done in the classroom. Therefore, some after the fact judgment by the school must be allowed. For example, if a teacher showed an X-rated movie to elementary school students, surely the teacher could be fired, even absent a regulation against such a showing.

Hence, this case does not end our search for the appropriate standard. However, the court agrees with the *Mailloux* court's reference to the seriousness of the sanction as a relevant consideration in reviewing a school's disciplining a teacher for exercising poor judgment in selection of classroom materials.

In *Keefe v. Geanakos*, 418 F.2d 359 (1st Cir.1969), a tenured high school teacher assigned an article from the *Atlantic Monthly* which contained the word "motherfucker." He explained the word and why the author had included it, and allowed any student who found the word offensive to choose an alternative assignment. The court granted a preliminary injunction against dismissal, finding a substantial likelihood that the plaintiff would prevail on the merits, based both on the appropriateness of the material and on the lack of notice that discussion of the article with a class of high school seniors was forbidden conduct. By stating that it was probable that the plaintiff would prevail in showing that he had no notice his conduct was for-

bidden, without explaining what would be the case if the plaintiff made such a showing, the court implied that such a showing alone would be enough for the plaintiff to prevail on the merits. As explained above, this court does not accept such a rule.

Several courts have used standards which give little deference to the decisions of school administrations, and require a showing that the complained of actions of the teacher had a "disruptive effect." In *Dean v. Timpson Independent School District*, 486 F.Supp. 302 (E.D.Tex.1979), a high school teacher was fired for assigning an article in *Psychology Today* entitled "Masculinity—What it Means to be a Man?" The court found a violation of the teacher's First Amendment rights, and stated that the state may only control a teacher's academic freedom if the classroom speech has a material or substantial disruptive effect. *Id.* at 307. Likewise, in *Webb v. Lake Mills Community School District*, 344 F.Supp. 791 (N.D.Iowa 1972), where a high school drama teacher was fired for selecting plays which displayed scenes of vulgarity and drunkenness, the court found for the teacher, holding it was arbitrary and capricious to fire a teacher for selecting plays which were in conformity with the rules as stated to her and did not have a disruptive effect. And in *Parducci v. Rutland*, 316 F.Supp. 352 (M.D. Ala.1970), a probationary high school teacher was fired for assigning a story written by Kurt Vonnegut, Jr. The court found that the defendants failed to demonstrate that assignment was not appropriate reading and was disruptive.

This court finds that while the outcome of these cases may well have been appropriate, the standards of review stated do not provide for sufficient deference to the judgment of the school administrations. In *Parducci*, the court placed the burden on the school to prove that the assigned materials were both inappropriate and disruptive. Yet, as was stated earlier, some measure of deference must be accorded to the judgment of the school as to the appropriateness of curriculum materials. Also, the school should not have to show that assigned materials were disruptive. The court is uncertain of what is meant by "disruptive" in this context. Perhaps "disruption" refers to complaints. Perhaps it refers to wild behavior by the students. Yet, a school should be able to find materials inappropriate for the classroom even if the students quietly acquiesce to the use of the materials. For example, a school could fire a teacher for showing hard core pornography or an X-rated movie, even in the unlikely event that the students happen to unanimously approve of the idea, and watch quietly and attentively. Likewise, *Webb* and *Dean* seem to state that a disruptive effect is necessary to fire a teacher for use of materials not in violation of any preexisting rule, regardless of the appropriateness of the material. Again, the court rejects this standard.

Not all cases addressing the issue of after the fact firings have held that First Amendment rights have been violated. In *Brubaker v. Board of Education*, 502 F.2d 973 (7th Cir.1974) (*en banc*), three non-tenured elementary school teachers were fired for distributing a poem entitled "Getting Together" to eighth grade students. The district court found for the school, stating that the school's determination that the poem was unsuitable reading was not "wholly unsupported in fact or without reason." *Id.* at 983. The Seventh Circuit affirmed the outcome, but expressly refused to state a standard of review; the court found it unnecessary to state a standard of review, as it felt that a thorough recitation of the facts made it clear that the plaintiff's First Amendment rights had not been violated in that case. *Id.* at 985. Moreover, the court implied a rejection of the standard stated by the district court. *Id.* at 983. Thus, *Brubaker* does not supply us with a standard of review.

In *Parker v. Board of Education*, 237 F.Supp. 222 (D.Md.1965), *aff'd on other grounds*, 348 F.2d 464 (4th Cir.1965); a probationary high school teacher was fired for assigning Aldous Huxley's book entitled *A Brave New World*. The County Board's reading list contained the book, along with a caution that "great care [should] be taken in making book assign-

ments." *Id.* at 115. The court dealt with the prior notice issue by stating that the school had the right to require that the teacher adhere to the caution on the reading list. The court further noted that the plaintiff had cited no case supporting his First Amendment claim (this case preceded all other cases cited in this opinion). Thus, the court gave great deference to the school's after the fact determination that assignment of the book was inappropriate, providing no discussion whatsoever of the value or offensiveness of the book. This court is unwilling to state a rule that the school may fire a teacher after the fact, without prior notice beyond a general "use appropriate discretion" type of standard (which the court considers to be akin to no standard at all, as stated earlier), without *any* review of the nature of the material in question. Such a rule could create a "pall of orthodoxy" over the classroom, stifling innovation and encouraging teachers to take the "safe route." Such a rule would violate the dictates of *Keyishian.*

Therefore, the court is left without a clear standard of review. In seeking the appropriate standard, the court will consider the relevant concerns, gleaned from the above discussion. We begin by noting that schools should not be allowed to fire teachers after the fact for classroom expression, in absence of notice that the expression was prohibited, without some review by the courts. "When one must guess what conduct or utterance may lose him his position, one necessarily will 'steer far wider of the unlawful zone.'" *Keyishian,* 385 U.S. at 604, 87 S.Ct. at 684 (citation omitted). Therefore, to forbid a teacher from using a particular item in the classroom is less restrictive of a teacher's creativity and experimentation than a requirement of "appropriate judgment." Such a vague standard has the effect of forcing teachers to guess what is permissible, thus encouraging teachers to avoid innovation and to take the safe, standard route.[5] Consequently, "[t]he danger of that chilling effect upon the exercise of vital First Amendment

rights must be guarded against by sensitive tools which clearly inform teachers what is being proscribed." *Id.* Thus, the standard of reviewing schools' after the fact firings should be less deferential than the ones stated by the district courts in *Brubaker* and *Parker;* it should be less deferential than the standard of reviewing schools' prior regulations which give notice of what material may not be used in the classroom.

The court also believes that an appropriate standard of review would consider the severity of the sanction imposed upon the teacher, as suggested by the court in *Mailloux,* 323 F.Supp. at 1392, because the severity of the sanction is proportional to the chilling effect. If a teacher with an otherwise unblemished record were fired for using a controversial teaching method, the chilling effect would be great. If, on the other hand, that teacher merely received a written warning, the chilling effect would be much less.

Finally, the court reiterates that deference must be given to the judgment of the school administration, for all the reasons given in the earlier discussion of the need to allow school administrations to establish the contents of the curriculum. While a school board is "not free to fire teachers for every random comment in the classroom," *Zykan,* 631 F.2d at 1305, "[i]t is the duty of the teacher to be cognizant of and sensitive to the feelings of his students, their parents, and their community." *Sterzing,* 376 F.Supp. at 661. It is the function of the school administration to see to it that teachers fulfill this duty. Therefore, the standard of review should be more deferential to the school than those stated in *Cooper, Mailloux, Sterzing, Keefe, Dean, Webb,* and *Parducci.*

Considering all these factors, the court adopts the following standard of review: was it reasonable for the school not to enter into a new one year employment contract with the teacher for showing the film. Whether it was reasonable depends upon

---

5. Thus, in the classroom, prior restraint is actually more permissible than after the fact punishment, unlike other areas of First Amendment

law. *See, e.g., Near v. Minnesota,* 283 U.S. 697, 713, 51 S.Ct. 625, 75 L.Ed. 1357 (1931).

two factors. The first is whether the school could reasonably find that showing the film offended the "legitimate pedagogical concerns" of the school, given the considerations stated in the earlier discussion of the school's right to establish the contents of the curriculum. The second factor is the severity of the sanction. Thus, the standard stated here is less deferential than a standard of "could a reasonable person find the assigned material inappropriate." In some situations, materials used could be deemed inappropriate, yet termination would be unreasonable. It is not reasonable to fire a teacher for *any* indiscretion; the indiscretion must be of significant enough importance to justify such a severe sanction. The standard adopted here provides for substantial deference to the judgment of the school administration, yet tempers that deference with a recognition of the chilling effect that results from so severe a sanction when no previously publicized rule is violated.

■ Applying this standard to the case before the court, and keeping in mind the standard of substantial likelihood of success on the merits, as it relates to the motion for a preliminary injunction, the court finds that there is not a substantial likelihood that plaintiff will be able to demonstrate that the school's decision not to enter into a new one year contract with her was unreasonable. The court expresses no opinion of whether it agrees with the decision. Rather, the court finds that the extent of the vulgarity and sexual explicitness in the film was such that it is likely that the evidence will demonstrate that the school could reasonably have determined that its showing was a serious indiscretion. The school could further reasonably have found that the length of the film indicates that its showing was more than an inadvertent mistake or a mere slip of the tongue, but rather was a planned event, and thus indicated that the teacher's approach to teaching was problematic. *See Hetrick v. Martin,* 480 F.2d 705 (6th Cir.1973) (school has right to fire teacher because of displeasure with her pedagogical attitude as demonstrated by a number of occurrences).

Having determined that plaintiff does not have a substantial likelihood of success on the merits, the court turns to the other three factors to be considered in deciding whether to issue a preliminary injunction. However, the court notes that the merits of the dispute are often intertwined with the other three factors. *Libertarian Party of Indiana v. Packard,* 741 F.2d 981, 985 (7th Cir.1984).

On the issue of irreparable injury, plaintiff points out that the loss of First Amendment freedoms constitutes irreparable injury. *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976) (plurality opinion); *Packard,* 741 F.2d at 985. However, the court has found that plaintiff has no substantial likelihood of demonstrating that she was deprived of her First Amendment rights. Therefore, the "irreparable injury" factor does not weigh heavily in the court's decision in this particular case.

■ In weighing the threatened injury to plaintiff against the threatened harm an injunction may inflict on defendants, the court finds that the harm in either case is severe. For an employee, loss of employment is a severe harm. For an employer, being forced to retain an employee it wishes not to employ is also a severe harm. The fact that the teacher in this case is near tenure raises the stakes equally for both parties. For plaintiff, becoming tenured is highly desirable, and for defendants, preventing teachers it deems inadequate from becoming tenured is a vital concern. The court considers any threatened injury to plaintiff in the form of deprivation of First Amendment rights to be a minimal factor in balancing the threatened harms in this case, given the court's finding on the merits. Thus, the balancing of injuries factor favors neither party.

Finally, the court determines that the "public interest" factor is indistinguishable from the merits issue in this case. The public has interests both in school administrations shaping the content of what is taught to children in public schools and in protection of teachers' academic freedom. The public interest relevant to this case is

that the court properly balance these concerns. That balancing forms the essence of the court's discussion of the merits. Consequently, the court finds that issuance of the injunction would not serve the public interest.

## CONCLUSION

The court has scrutinized the four factors to be considered in deciding whether to issue a preliminary injuction. Under the facts of this case, the "substantial likelihood of success on the merits" factor weighs most heavily in the court's decision. The court finds that plaintiff is unlikely to demonstrate that the school administration's decision not to enter into a new one year contract with her violated her First Amendment rights, even if she can demonstrate that her showing of a sexually explicit film containing vulgar language entitled "About Last Night" to her third year high school class was a substantial factor in the decision not to renew her one year contract. Therefore, the motion for a preliminary injunction is denied. This case is set for status and/or the setting of a date for a trial on the merits on May 12, 1989.

IT IS SO ORDERED.